**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0349
Charles Clark et al.
v.
Thomas B. Leigh, M.D. et al.

No. S26X0350
Thomas B. Leigh, M.D. et al.
v.
Charles Clark et al.

On Appeal from the State Court of Bibb County
No. 20SCCV091967

Argued: February 3, 2026 ─ Decided: June 16, 2026

PETERSON, Chief Justice.

This appeal involves the constitutionality of the noneconomic damages cap on wrongful death damages set forth in OCGA § 51-13-1(b). This appeal and cross-appeal also involve nonconstitutional issues raised by the parties. We conclude that the trial court did not abuse its discretion in allowing the defendants in this case to raise the application of OCGA § 51-13-1(b) for the first time in their post-trial motions. We reaffirm the framework set out in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731 (2010), and the holding of that case: the Georgia Constitution's right to trial by jury does not permit the application of OCGA § 51-13-1(b)'s damages cap to damages for pain and suffering and loss of consortium in medical malpractice actions. And in the light of that holding, ordinary principles of statutory construction show that OCGA § 51-13-1's limit on

certain noneconomic damages cannot apply to the judgment in this case; given the damages awarded in this case, *Nestlehutt* prevents the cap from operating in the way the statute requires, and changing the statute to make it operative would require rewriting the statute, which we cannot do. Accordingly, we vacate the trial court's grant of the defendants' motion to remit and amend the judgment. But because the trial court did not consider one argument raised by the defendants in their motion for new trial given its determination that OCGA § 51-13-1's cap applied, we remand for the trial court to decide that claim.

## I. *Facts and Procedure*

In May 2019, April S. Clark had surgery to remove an ovarian cyst, during which her bowel was perforated. Following the surgery, while under the care of Dr. Thomas Leigh, Dr. William Shirley, Dr. John Williams, and Dr. Thomas Woodyard, Clark experienced complications and ultimately died on June 27, 2019. Clark's husband, Charles Clark, and Clark's daughter, April D. Clark (collectively "the Clarks"), brought claims for the wrongful death of Clark: Charles as the statutory wrongful death plaintiff, and April D. as administrator of Clark's estate, for conscious pain and suffering and medical bills. The Clarks initially sued multiple parties, and several of them settled before trial. The defendants who went to trial (and who now appeal) — Dr. Leigh, Dr. Shirley, and OB/GYN Specialists, LLP ("the doctors") — participated in Clark's post-operative care.

At a jury trial in July 2024, the jury returned a verdict in the Clarks' favor. The jury awarded $29,250,000 for the full value of Clark's life, $2,500,000 for Clark's pain and suffering, and $1,715,176 for medical expenses. The doctors brought a motion for new trial, which was later amended, and a motion to remit and amend the judgment. The trial court denied the doctors' motion

2

for new trial and granted the doctors' motion to remit and amend the judgment, holding that OCGA § 51-13-1(b) applied to limit the wrongful death award, and reduced the $29,250,000 awarded to Charles for wrongful death to $350,000. The amount awarded to the estate for pain and suffering and medical expenses was unchanged.

## *Case No. S26A0349*

### II. *The Clarks' Appeal*

The Clarks appeal the trial court's order granting the doctors' motion to remit and amend the judgment. The Clarks argue that the trial court erred in: (1) concluding that the doctors had not waived the right to assert the noneconomic damages cap in OCGA § 51-13-1(b); (2) concluding that it could enforce the noneconomic damages cap as to wrongful death claims without effectively rewriting the statute, in violation of the constitutional separation of powers and general severability principles; (3) concluding that enforcing the noneconomic damages cap as to wrongful death claims would not violate the right to trial by jury; and (4) concluding that enforcing a noneconomic damages cap as to wrongful death claims would not violate equal protection guarantees.[1]

---

[1] We appreciate the assistance of several amici curiae who filed briefs in this case and the similar cases of *Cayamcela v. Advocacy Trust, LLC* (Case No. S26A0229) and *Hospitalist Services of Georgia, P.C. v. Advocacy Trust, LLC* (Case No. S26A0242) (together, "*Advocacy Trust*"): Access to Justice for Georgia, Inc.; the Attorney General of Georgia; Clinton Crawford (plaintiff in a pending unrelated wrongful death suit); The Georgia Hospital Association, Inc., the Georgia Health Care Association, Inc., and the Medical Association of Georgia; the Georgia Trial Lawyers Association; Jameka Mitchell and Renita Walker (plaintiffs in pending unrelated wrongful death suits); John Como (plaintiff in a pending unrelated medical malpractice suit); Paul Kogut (plaintiff in a pending unrelated medical malpractice suit); United States Chamber of Commerce, Georgia Chamber of Commerce, and Georgians for

## A. *Legal Background*

We begin with a brief historical summary of Georgia's constitutional right to trial by jury as well as the recent history of its application to relevant statutes.

### 1. *Right to Trial by Jury*

Georgia's guarantee of the right to trial by jury first appeared in our state constitution in 1777. See Ga. Const. of 1777, Art. LXI ("Freedom of the press, and trial by jury, to remain inviolate *forever*."). The provision remained in similar language in the 1789 Constitution. See Ga. Const. of 1789, Art. IV, Sec. III ("Freedom of the press, and trial by jury shall remain inviolate."). A jury trial provision was also included in the 1798 Constitution, but with new language directing that "[f]reedom of the press, and trial by jury, *as heretofore used in this State*, shall remain inviolate …." Ga. Const. of 1798, Art. IV, Sec. V (emphasis added). However, in the 1861 and 1865 Constitutions, the only jury trial provision was specifically for criminal trials. See Ga. Const. of 1861, Art. I, Par. XI ("Every person charged with an offence against the laws of the State shall … have a public and speedy trial by an impartial jury."); Ga. Const. of 1865, Art. I, Par. VIII ("Every person charged with an offence against the laws of the State … shall have a public and speedy trial by an impartial jury, as heretofore practised in Georgia."). Unlike the earlier constitutions, the Constitutions of 1861 and 1865, did not include any broader provision protecting jury trials as "inviolate." A general jury-trial provision was included in the 1868 Constitution. See Ga. Const. of 1868, Art. V, Sec. XIII ("The right

---

Lawsuit Reform; and Yvonne Young (plaintiff in a pending unrelated medical malpractice and wrongful death suit).

4

of trial by jury, except where it is otherwise provided in this constitution, shall remain inviolate."). The 1868 Constitution was the first Constitution to refer to "[t]he *right* of trial by jury." Id. (emphasis added). The provision has been carried forward in materially identical form into every Constitution since, including in our current Constitution. See Ga. Const. of 1877, Art. VI, Sec. XVIII, Par. I ("The right of trial by jury, except where it is otherwise provided in this Constitution, shall remain inviolate …."); Ga. Const. of 1945, Art. VI, Sec. XVI, Par. I ("The right of trial by jury except where it is otherwise provided in this Constitution, shall remain inviolate …."); Ga. Const. of 1976, Art. VI, Sec. XV, Par. I ("The right of trial by jury, except where it is otherwise provided in this Constitution, shall remain inviolate …."). In the current 1983 Constitution, the general jury trial provision was moved from Article VI, which governs the judicial branch generally, to our Bill of Rights in Article I and consolidated with the provision guaranteeing the right to a jury trial in criminal trials. See Ga. Const. of 1983, Art. I, Sec. I, Par. XI(a) ("Paragraph XI(a)" ("The right to trial by jury shall remain inviolate, except that the court shall render judgment without the verdict of a jury in all civil cases where no issuable defense is filed and where a jury is not demanded in writing by either party. In criminal cases, the defendant shall have a public and speedy trial by an impartial jury; and the jury shall be the judges of the law and the facts.").

2. *Application to Relevant Statutes*

In 2005, the General Assembly enacted OCGA § 51-13-1 (the "cap statute"). See Ga. L. 2005, pp. 1, 16–17, § 13. The cap statute provides that certain noneconomic damages awards in medical malpractice suits are limited to a specified amount. As relevant here, subsection (b) of OCGA § 51-13-1 provides that "[i]n

5

any verdict returned or judgment entered in a medical malpractice action, including an action for wrongful death, against one or more health care providers, the total amount recoverable by a claimant for noneconomic damages in such action shall be limited to an amount not to exceed $350,000.00[.][2]

---

[2] The full text of the relevant sections of the statute is as follows:

(a) As used in this Code section, the term:
    (1) "Claimant" means a person, including a decedent's estate, who seeks or has sought recovery of damages in a medical malpractice action. All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant.

…
    (4) "Noneconomic damages" means damages for physical and emotional pain, discomfort, anxiety, hardship, distress, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium, injury to reputation, and all other nonpecuniary losses of any kind or nature. This term does not include past or future:
        (A) Medical expenses, including rehabilitation and therapy;
        (B) Wages or earnings capacity;
        (C) Income;
        (D) Funeral and burial expenses;
        (E) The value of services performed by the injured in the absence of the injury or death including those domestic and other necessary services performed without compensation; or
        (F) Other monetary expenses.
(b) In any verdict returned or judgment entered in a medical malpractice action, including an action for wrongful death, against one or more health care providers, the total amount

In 2010, this Court in *Nestlehutt* held that the cap statute's noneconomic damages cap as applied to pain and suffering and loss of consortium damages in medical malpractice actions violated Paragraph XI(a). *Nestlehutt*, 286 Ga. at 731, 738. See also *Med. Ctr. of Cent. Ga., Inc. v. Turner*, 322 Ga. 129, 131–32 (2025). In so holding, the Court in *Nestlehutt* explained that Paragraph XI(a) "guarantees the right to a jury trial only with respect to cases as to which there existed a right to jury trial at common law

recoverable by a claimant for noneconomic damages in such action shall be limited to an amount not to exceed $350,000.00, regardless of the number of defendant health care providers against whom the claim is asserted or the number of separate causes of action on which the claim is based.

(c) In any verdict returned or judgment entered in a medical malpractice action, including an action for wrongful death, against a single medical facility, inclusive of all persons and entities for which vicarious liability theories may apply, the total amount recoverable by a claimant for noneconomic damages in such action shall be limited to an amount not to exceed $350,000.00, regardless of the number of separate causes of action on which the claim is based.

(d) In any verdict returned or judgment entered in a medical malpractice action, including an action for wrongful death, against more than one medical facility, inclusive of all persons and entities for which vicarious liability theories may apply, the total amount recoverable by a claimant for noneconomic damages in such action shall be limited to an amount not to exceed $350,000.00 from any single medical facility and $700,000.00 from all medical facilities, regardless of the number of defendant medical facilities against whom the claim is asserted or the number of separate causes of action on which the claim is based.

(e) In applying subsections (b), (c), and (d) of this Code section, the aggregate amount of noneconomic damages recoverable under such subsections shall in no event exceed $1,050,000.00.

....

7

or by statute at the time of the adoption of the Georgia Constitution in 1798." *Nestlehutt*, 286 Ga. at 733 (quotation marks omitted) (quoting *Benton v. Ga. Marble Co.*, 258 Ga. 58, 66 (1988)). *Nestlehutt* thus set forth a framework for analyzing constitutional right to trial by jury claims. In applying that framework to the medical malpractice claims at issue in that case, the Court examined common law history pertaining to medical malpractice claims and the damages that were available in such claims. Id. at 733–35. The Court ultimately concluded "that at the time of the adoption of our Constitution of 1798, there did exist the common law right to a jury trial for claims involving the negligence of a health care provider, with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury." Id. at 735. The noneconomic damages at issue there were for pain and suffering and loss of consortium. See id. at 731.

*Nestlehutt*'s holding and its framework for analyzing right to trial by jury claims were confirmed in two recent cases — *Taylor v. Devereux Foundation, Inc.,* 316 Ga. 44 (2023), and *Turner*, 322 Ga. 129.

*Taylor* upheld the statutory cap on punitive damages found in OCGA § 51-12-5.1(g) (capping most punitive damage awards at $250,000) when there was no allegation the defendant engaged in intentional misconduct. 316 Ga. at 44–45. In doing so, *Taylor* applied and explained *Nestlehutt*'s framework. The Court explained, "[i]f the type of claim at issue in this case is one as to which there existed a right to trial by jury as of 1798, our Constitution's right to a trial by jury applies in the same way the right applied in 1798. For other types of claims, the right does not attach." Id. at 57–58. See also id. at 58–59 ("[T]o determine whether a party has a right to a jury trial for a particular claim,

8

we must determine whether such a claim existed and was decided by a jury in Georgia in 1798."). Applying that framework, the Court then held that the statutory cap on punitive damages did not violate the right to trial by jury because the plaintiff could not "show that a Georgia jury in 1798 would have been authorized to award the kind of punitive damages" she sought. Id. at 60.

In *Turner*, a jury awarded the plaintiff $7,200,000 in noneconomic damages for wrongful death. 322 Ga. at 129. The defendants there brought a motion in the trial court to reduce the noneconomic damages award to the maximum amount allowable under subparagraphs (b) and (c) of the cap statute. Id. at 129–30. The trial court denied the motion, stating that this Court had already "found [the caps] to be unconstitutional" in *Nestlehutt*. Id. at 130. The Court of Appeals affirmed. See id. (citing *Med. Ctr. of Cent. Ga., Inc. v. Turner*, 372 Ga. App. 644, 652–55 (2024)). We granted certiorari, vacated the decision of the Court of Appeals, and remanded for the trial court to apply "the analytical framework set out by our precedent to the wrongful death claim and the 'full value of the life' damages awarded in this case." Id. at 131. *Turner* described the *Nestlehutt* framework as follows:

> [W]e consider[] whether the type of underlying claim of liability at issue (i.e., a medical malpractice claim) existed in Georgia in 1798, whether the right to trial by jury attached for that type of claim in Georgia in 1798, and whether the damages awarded by the jury (i.e., noneconomic damages for pain and suffering and loss of consortium) were damages determined by juries for that type of claim in Georgia in 1798.

Id. at 131–32. The Court also stated that "[i]n evaluating the type of underlying claim of liability at issue under *Nestlehutt*'s framework, we do not require a perfect match in nomenclature

9

and a suitable analog cognizable 'under late eighteenth century English common law' may suffice." Id. at 132 n.3 (quoting *Nestlehutt*, 286 Ga. at 733). The Court explained the limited scope of *Nestlehutt*'s holding. "In *Nestlehutt*, the only issue before us was whether OCGA § 51-13-1's caps could be constitutionally applied to reduce a jury's award of noneconomic damages for pain and suffering and loss of consortium following a verdict in the plaintiffs' favor for medical malpractice claims." Id. at 131. "[T]he analytical framework that we set out and applied in *Nestlehutt* … was claim- and remedy-specific." Id. at 132. "Therefore, because the question of whether OCGA § 51-13-1's caps can be constitutionally applied to statutory wrongful death claims (and their associated 'full value of the life' damages) was not at issue in *Nestlehutt*, the *Nestlehutt* Court could not (and did not) decide the issue presented in this case." Id. And because the trial court in *Turner* did not apply the analytical framework set by our precedent to the wrongful death damages award, the Court "decline[d] to apply that framework in the first instance" and vacated the decision of the Court of Appeals and remanded with direction for the Court of Appeals to return the case to the trial court. Id. at 132–33.

### B. *The Parties' Arguments*

The Clarks argue that the doctors waived their right to assert the cap statute's damages cap by failing to raise it in the Pretrial Order. And relying on principles of severability and statutory construction, the plaintiffs[3] argue that in the light of *Nestlehutt*, the cap statute's damages cap may not be applied to

---

[3] In characterizing the plaintiffs' and the defendants' arguments in the remainder of the Clarks' appeal, we are addressing the arguments of the Clarks and the doctors, as well as the corresponding parties in *Advocacy Trust*.

10

the verdict in this case. Alternatively, the plaintiffs argue that applying the cap statute's damages cap to wrongful death claims violates Paragraph XI(a). The plaintiffs also argue that applying the cap statute to noneconomic damages for wrongful death claims violates equal protection. On the other hand, the defendants argue that they did not waive their right to assert the cap statute. And the defendants argue that even if *Nestlehutt* is still good law, the cap statute's damages cap may still be applied to just the wrongful death verdict here. The defendants also argue that applying the cap statute's damages cap to noneconomic damages for wrongful death does not violate the right to trial by jury, and that we should overrule *Nestlehutt* because the right to trial by jury is merely procedural. The defendants also argue that applying the cap statute's damages cap to noneconomic damages for wrongful death does not violate equal protection.

C.  *Analysis*

The trial court did not abuse its discretion in allowing the doctors to raise the application of the cap statute for the first time in their post-trial motions. We reject the defendants' invitation to reconsider *Nestlehutt*. We then conclude that, in the light of *Nestlehutt*, the Clarks' appeal is resolved under ordinary principles of statutory construction, because the cap statute is not capable of being applied in a case like this one, where a jury's verdict includes noneconomic damages for a cause of action to which the right to trial by jury applies. Because we resolve this case under the plain text of the cap statute in the light of *Nestlehutt*, we need not and do not decide most of the constitutional questions raised by the parties.

11

1. *The trial court did not abuse its discretion in allowing the doctors to raise the application of the cap statute for the first time in their post-trial motions.*

The Clarks argue that the trial court erred in determining that the doctors did not waive the right to assert the cap by failing to raise it in the Pretrial Order. We review the trial court's ruling for abuse of discretion. See *Ga. Dep't. of Human Res. v. Phillips*, 268 Ga. 316, 319–20 (1997). The trial court did not abuse its discretion.

The Civil Practice Act provides that the pretrial order, "when entered, controls the subsequent course of the action unless modified at trial to prevent manifest injustice." OCGA § 9-11-16(b). The pretrial order "recites the action taken at the [pretrial] conference and the agreements made by the parties as to any of the matters considered and … limits the issues for trial to those not disposed by admissions or agreements of counsel." Id. "The Code imposes a duty on each party to assist the trial court in formulating the pretrial order by defining the issues for trial, and deciding 'such other matters as may aid in the disposition of the action.'" *Phillips*, 268 Ga. at 318 (quoting OCGA § 9-11-16(a)). Unless the pretrial order is modified before or during trial, a party generally "may not advance theories or offer evidence that violate the terms of the pretrial order." Id.

Here, multiple consolidated pretrial orders were submitted and entered by the trial court prior to trial. In each pretrial order, including the operative Pretrial Order, the doctors argued that the Clarks are not entitled to any award of damages against the doctors but stated that "should the jury find in favor of plaintiffs, the applicable damages would be those damages appropriate pursuant to OCGA § 51-4-1 and OCGA § 51-12-2." Those statutes cited in the operative Pretrial Order define "full value of the life

of the decedent, as shown by the evidence[,]" see OCGA § 51-4-1, and general and special damages, see OCGA § 51-12-2. None of the pretrial orders, including the operative Pretrial Order, cited or discussed OCGA § 51-13-1(b) or any statutory cap on noneconomic damages. The doctors did not raise the cap issue at trial. The doctors eventually raised the cap issue for the first time in their post-trial motions after the jury awarded its cap-exceeding verdict.

In its order granting the doctors' motion to remit and amend the judgment, the trial court rejected the Clarks' argument that the doctors waived the cap by not raising it in the pretrial order. The trial court determined that the doctors "properly asserted the caps' application after a verdict and judgment were entered, establishing a 'total amount recoverable' in excess of the cap." The trial court explained that the cap statute's "caps do not present an issue for the jury to decide; they define the limits of the recovery a plaintiff may actually obtain following the jury's decision." And, the trial court reasoned, because the damages caps "'are automatically triggered when a damages award exceeds the threshold amount[,]' *Nestlehutt*, 286 Ga. at 737[,] … their enforcement only arises once there is a 'total amount recoverable by a claimant' which exceeds the cap, and they apply as a matter of law in that situation."

The Clarks argue that the trial court contravened this Court's decision in *Phillips*. See *Phillips*, 268 Ga. at 316. But *Phillips* is different from this case. There, the parties expressly agreed in the pretrial order that the $1,000,000-per-person damages cap in the Georgia Tort Claims Act would apply, but the trial court entered judgment in excess of the agreed-upon caps. See *Phillips*, 268 Ga. at 317–18. We held that "the trial court abused its discretion by implicitly modifying the pretrial order" to

13

support the higher award, and the Court reversed the "portion of the judgment awarding damages in excess of" the damages cap agreed to in the pretrial order. Id. at 319–20.

Here, in contrast, there were neither affirmative representations nor an express agreement by the parties that a damages cap would or would not apply — there was merely silence. And the Clarks have cited no case from this Court where the right to assert a statutory damages cap following a cap-exceeding jury verdict was waived for failure to raise that issue in the pretrial order or during trial. Although certain defenses can be waived (e.g., improper service or statute of limitations) if not timely raised,[4] the cap statute is not an affirmative defense. Instead, the cap statute sets a statutory limit as to the amount of damages for certain claims. Thus, the trial court did not abuse its discretion in allowing the doctors to raise the application of the cap statute for the first time in their post-trial motions. Cf. *Scott v. Battle*, 249 Ga. App. 618, 622 (2001) (rejecting the plaintiff's argument that the defendant waived the right to seek a reduction in punitive damages pursuant to OCGA § 51-12-5.1(g) by, among other things, not raising the "issue until a post-trial hearing on a motion for new trial," because an exception to the cap-exceeding verdict "is timely if raised before the entry of judgment or in any timely post-judgment motion").

2. *We adhere to* Nestlehutt.

The Clarks and the appellee in the similar cases of *Cayamcela v. Advocacy Trust, LLC* and *Hospitalist Services of Georgia, P.C. v. Advocacy Trust, LLC* (collectively across all the cases, "the plaintiffs") argue that applying the cap statute's limit

---

[4] See *Long v. Marion*, 257 Ga. 431, 432–34 (1987); *Gaul v. Kennedy*, 246 Ga. 290, 290–91 (1980).

14

on noneconomic damages to wrongful death claims violates Paragraph XI(a), relying on *Nestlehutt* and its progeny. See *Nestlehutt*, 286 Ga. at 731–38 (holding that the cap statute's noneconomic damages cap as applied to damages for pain and suffering and loss of consortium in medical malpractice actions violates the Georgia Constitution's guarantee of the right to trial by jury). See also *Taylor,* 316 Ga. at 55–81; *Turner*, 322 Ga. at 130–33. The plaintiffs also offer dates that are different from the dates to which we have previously looked to determine what the right to trial by jury protects, and the plaintiffs argue that they would prevail under any of the possible dates. In contrast, the doctors and the appellants in *Advocacy Trust* (collectively across all the cases, "the defendants") argue that applying the cap statute's limit on noneconomic damages to wrongful death claims does not violate the right to trial by jury. Those parties also argue that we should overrule *Nestlehutt*.

We start by determining whether to overrule *Nestlehutt*. We conclude that stare decisis warrants adhering to *Nestlehutt*. Whether or not *Nestlehutt* was inarguably correct that the right to trial by jury includes the right to have a jury determine without legislative interference claims and remedies that juries decided as of 1798, history and precedent provide material support for that holding. And that, at the very least, means that *Nestlehutt* was not clearly wrong. This conclusion, viewed through the lens of stare decisis, preserves *Nestlehutt*'s holding. Accordingly, we adhere to *Nestlehutt*.

> (a) *Stare decisis is a strong default rule and preserves holdings absent a showing of clear or obvious error.*

"When we are asked to reconsider and overrule one of our prior decisions, stare decisis is the strong default rule." *Homewood Assocs., Inc. v. Unified Gov't of Athens-Clarke County,*

15

323 Ga. 62, 70 (2025) (quotation marks omitted). There are a variety of reasons for this rule:

> Ours is a system of precedent, built on the premise, if not a promise, that future cases will be decided like similar past cases. Sticking to our precedent promotes a system of equal treatment under the law rather than one of arbitrary discretion. Such a system not only yields a body of law that is more stable, predictable, and reliable: it is also the only kind of system that is consistent with the rule of law.

Id. (quotation marks omitted). This system "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *State v. Burns*, 306 Ga. 117, 123 (2019) (quotation marks omitted).

In applying stare decisis, we consider "features of the precedent at issue that bear on whether it would be more harmful to leave the question at issue 'decided' or have it 'decided right.'" *Wasserman v. Franklin County*, 320 Ga. 624, 645 (2025) (quoting *Olevik v. State*, 302 Ga. 228, 245 (2017)). "Some of those features bear quite directly on rule-of-law concerns. As a threshold matter, precedents that are not just wrong but unreasoned, or which disregard the basic legal principles that courts use to do law, are ripe for overruling." Id. (cleaned up). Such cases allow for "arbitrary discretion," as do cases that set out rules of decision that are "truly 'unworkable': precedents that leave courts without manageable standards to cabin judicial discretion and invite courts to make policy decisions instead of doing law." Id. at 646. "In a similar vein, we have been less inclined to preserve holdings that conflict with — or as we have put it in various decisions, are a departure from, dissonant with, inconsistent with, contrary to,

16

or an aberration in — precedent in the same area, because keeping such decisions can undermine rather than promote a system of equal treatment under the law." Id. (cleaned up). In contrast, if a court reaches its holding "through a decision that carefully applies sound, generally accepted legal principles," that "is clear evidence of a proper exercise of the judicial power — that is, that the court is simply doing the job our Constitution gives it," and so we will be more inclined to preserve it. *Ammons v. State*, 315 Ga. 149, 170 (2022) (Pinson, J., concurring). In other words, "if nothing has changed besides the makeup of the court, overruling those kinds of decisions merely because the new personnel would come out on the other side of a reasonable debate ordinarily would do greater harm to the rule of law than leaving them settled." Id. at 171 (Pinson, J., concurring).

"In addition to those concerns driven by respect for the rule of law, we have considered a limited set of more practical consequences when applying stare decisis." *Wasserman*, 320 Ga. at 647.

> First, we have long considered so-called reliance interests: at the least, when parties have long relied on a legal rule in making decisions affecting property or contract rights, courts are especially hesitant to unsettle precedents that could disrupt or destroy such thought-to-be-settled rights. Second, although the age of a precedent by itself is a poor gauge of whether it should be retained, a legal rule might be so deeply entrenched in the body of law that trying to dig it out would do more harm than good. Third, we have typically applied stare decisis with less force to precedents that interpret a constitutional provision than to precedents that

17

interpret statutes, reasoning that it is harder as a practical matter for the people to correct constitutional precedents.

Id. (cleaned up). That said, although "stare decisis carries less weight when our prior precedent involved the interpretation of the Constitution," that "doesn't mean that we disregard stare decisis altogether[.]" *Olevik*, 302 Ga. at 245. Instead, the soundness of the reasoning of the prior precedent "becomes even more critical. The more wrong a prior precedent got the Constitution, the less room there is for the other factors to preserve it." Id. We generally do not overrule cases unless they are "clearly" or "obviously and harmfully" wrong. *Stephens v. State*, 321 Ga. 651, 658 (2025); *Wasserman*, 320 Ga. at 647 (quotation marks omitted).

Finally, "[t]hese considerations are guideposts, not a mechanical formula or a multi-factor test. At bottom, the question whether to overrule a precedent comes down to whether getting the law right is worth the cost to the rule of law of unsettling what had been settled. For the overwhelming majority of precedents, the juice is not worth the squeeze. But in rare cases — when a precedent is not just wrong, but 'obviously and harmfully' so — stare decisis is not a bar to getting the law right." *Wasserman*, 320 Ga. at 647 (citations omitted).

(b) *History and precedent provide support for* Nestlehutt*'s holding that the right to trial by jury is substantive, not merely procedural.*

This is not one of those rare cases; the defendants have not shown that *Nestlehutt*'s holding was obviously and harmfully wrong. We consider *Nestlehutt*'s holding in three parts. First, we consider the holding that the right to trial by jury is substantive

18

and not merely procedural.[5] We conclude that history and

---

[5] Throughout this opinion, we frame the holding of *Nestlehutt* in part as deciding that the Georgia Constitution's right to trial by jury is substantive and not merely procedural. That framing does not appear in *Nestlehutt* or in any of this Court's numerous majority opinions that cite *Nestlehutt*. Instead, that is the defendants' framing, based on what the Supreme Court of Oregon adopted in interpreting its own constitution in *Horton v. Oregon Health & Science University*, 359 Or. 168, 226, 243 (2016).

Although *Nestlehutt* referred to an "attendant right," that reference does not necessarily suggest a division of procedure and substance. In referring to an "attendant right," this Court concluded that there existed a "common law right to a jury trial for claims involving the negligence of a health care provider, with an attendant right" to have a jury determine the "the full measure of damages, including noneconomic damages." 286 Ga. at 735. In context, this usage should be understood to mean that the common law right to have a jury decide damages accompanied or was a part of the right to have a jury decide liability. See *Kinslow v. State*, 311 Ga. 768, 773 (2021) ("[W]ords, like people, are judged by the company they keep."); 3 William Blackstone, *Commentaries* *397 (in describing "interlocutory" or "incomplete" judgments, where the right of the plaintiff had been established, but the "*quantum* of damages sustained by him is not," Blackstone explained that the determination of amount of damages "cannot be done without the intervention of a jury," so "where damages are to be recovered, a jury must be called in to assess them; unless the defendant, to save charges, will confess the whole damages laid in the declaration").

Even if we could draw precise lines between procedural and substantive components of the right, our case law, as recognized by *Nestlehutt*, suggests that both were preserved in the constitutional provision:

> The constitutional provision guaranteeing the right to trial by jury preserved not merely the form or mode of trial, but the right of trial by jury *in all its essential elements* as it existed at common law and as it obtained in this State at the date of the adoption of our earliest constitution.

*Nestlehutt*, 286 Ga. at 735 (cleaned up; quoting *Pollard v. State*, 148 Ga. 447, 454 (1918) (emphasis added)). Thus, our use of this procedural-substantive framing here should not be misunderstood as an acceptance of it as the only correct way to understand *Nestlehutt*'s holding. It may be that a better framing

precedent contain enough support for that holding that defendants have not shown that it was wrong. Second, we consider the aspect of *Nestlehutt*'s holding that defines the scope of the right based on what juries decided in 1798 and conclude that we need not definitively resolve the question of the appropriate date by which the right is measured because there is no indication that any of the various options would yield a different result as to the claim and remedy at issue in *Nestlehutt*. And finally, we consider the claim- and remedy-specific framework that *Nestlehutt* applied and conclude that stare decisis preserves that, too.

In invalidating the cap statute as applied to pain and suffering and loss of consortium damages in medical malpractice actions, we concluded in *Nestlehutt* "that at the time of the adoption of our Constitution of 1798, there did exist the common law right to a jury trial for claims involving the negligence of a health care provider, with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury." *Nestlehutt*, 286 Ga. at 735. We held that the same right was preserved by the 1983 Constitution. These conclusions find support in history and precedent.

The defendants argue that we should overrule *Nestlehutt* because, as stated by a defense brief, it "erroneously morphs the procedural right to have a jury decide facts into a substantive guarantee of a particular result." They claim that the right to trial

---

is in terms of a constitutional requirement that the procedural right to trial by jury be meaningful, and that a right to trial by jury that permitted legislative invalidation of jury verdicts protected by that right is simply not sufficiently meaningful. But we need not and do not resolve this framing question to decide the issues presented in this case, and so our use of the term "substantive" throughout the opinion should be understood in this light.

by jury guarantees only that a jury (rather than a judge) determines facts, and the right does not impede the legislature's authority to alter legal claims and remedies. Their argument relies on historical and founding-era sources and a Supreme Court of Oregon case, *Horton v. Oregon Health & Science University*, 359 Or. 168 (2016), that interpreted the Oregon Constitution's jury trial provision.

The defendants also point out that one member of this Court raised similar questions about *Nestlehutt*'s holding in a special concurrence to our decision in *Taylor*, noting that "it appears inconsistent with the traditional understanding of the constitutional right to trial by jury." *Taylor*, 316 Ga. at 102 (Colvin, J., concurring specially). Pointing to Blackstone's *Commentaries*, that concurrence stated that "[a]t common law, the right to a trial by jury functioned primarily as a procedural safeguard, limiting the potential for a corrupt or biased judge to work injustice on a party by dividing authority between judge and jury." Id. (citing 3 William Blackstone, *Commentaries on the Laws of England* \*379–80 (1768)). That division of authority between judge and jury included the right, at least in civil cases, of the jury to decide questions of fact, while judges decided questions of law.[6] See 3 William Blackstone, *Commentaries* \*373, 380; Austin Wakeman Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv. L. Rev. 669, 677 (1918) ("It may safely be said that at the time of the American Revolution the general principle was well established in the English law that juries must answer to

---

[6] We express no opinion here on the meaning of the provision in the 1983 Constitution stating that "the jury shall be the judges of the law and the facts." Ga. Const. of 1983, Art. I, Sec. I, Par. XI(a). But see *Powell v. State*, 307 Ga. 96, 105–06 (2019) (Peterson, J., concurring) (noting our interpretive history of this provision and observing that our current approach appears inconsistent with the text).

questions of fact and judges to questions of law." (cleaned up)). The *Taylor* special concurrence went on to observe that "it does not follow from the existence of a procedural right to have a jury, rather than a judge, make factual findings about damages that, as *Nestlehutt* concluded, the right to a jury trial also guarantees a substantive 'right to the *award of the full measure of damages* … as determined by the jury.'" *Taylor*, 316 Ga. at 104 (Colvin, J., concurring specially) (quoting *Nestlehutt*, 286 Ga. at 735 (emphasis added by concurrence)). And the special concurrence noted that "[b]ecause reducing a damages award as prescribed by law does not require a judge to act as a factfinder or substitute his judgment for that of the jury, doing so does not appear to 'infringe' on or 'nullif[y]' the procedural right to have a jury make factual findings regarding damages." Id. (quoting *Nestlehutt*, 286 Ga. at 735).

Today, we conclude that history and precedent support the idea that the right to trial by jury has a substantive component and is not merely a procedural right to have juries, rather than judges, decide questions of fact that may then be rendered irrelevant by statute. A merely procedural right to a jury trial would be hollow and illusory.

(i)  *The Historical Importance of the Right to Trial by Jury*

Since this Court's beginning, we have recognized that the right to trial by jury is a "principal bulwark of English and American liberties." *Craig v. Maltbie*, 1 Ga. 544, 546 (1846). The right long predates the first Constitution of this State and the Constitution of the United States. The right to trial by jury was protected in Article 39 of the Magna Carta in 1215: "No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any way, nor will we proceed with force against him, or send

22

others to do so, except by the lawful judgment of his equals or by the law of the land." Sir William Blackstone referred to the right to trial by jury "as the glory of the English law" and stated that it is "the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals." 3 William Blackstone, *Commentaries* *379. See also *Sons of Confederate Veterans v. Henry County Bd. of Comm'rs*, 315 Ga. 39, 48 (2022) (stating that "we have long accepted [Blackstone] as the leading authority on the common law"); *Nestlehutt*, 286 Ga. at 733 (citing *Rouse v. State*, 4 Ga. 136, 145–47 (1848)) (explaining that *Rouse* referred to Blackstone "as authoritative on the jury trial right as of 1798"). Blackstone viewed the right to trial by jury as a protection against the establishment of an aristocracy — "the most oppressive of absolute governments." 3 William Blackstone, *Commentaries* at *380. Thus, according to Blackstone:

> It is therefore, upon the whole, a duty which every man owes to his country, his friends, his posterity, and himself, to maintain to the utmost of his power this valuable constitution in all [its] rights; to restore it to [its] [ancient] dignity, if at all impaired by the different value of property, or otherwise deviated from its first institution; to amend it, wherever it is defective; and, above all, to guard with the most jealous circumspection against the introduction of new and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time imperceptibly undermine this best preservative of English liberty.

Id. at *381.

The founding generation considered the right to trial by jury fundamental to our system of government. In 1766, John Adams compared representative government and trial by jury to "the heart and lungs, the main spring, and the center wheel …. In these two powers consist wholly, the liberty and security of the people: They have no other fortification against wanton, cruel power: no other indemnification against being ridden like horses, fleeced like sheep, worked like cattle, and fed and cloathed like swine and hounds[.]" *III. The Earl of Clarendon to William Pym*, January 27, 1766, Nat'l Archives, https://founders.archives.gov/documents/Adams/06-01-02-0063-0004 (last visited May 7, 2026).[7] In 1789, Thomas Jefferson wrote in a letter to Thomas Paine, "I consider [trial by jury] as the only anchor, ever yet imagined by man, by which government can be held to the principles of [its] constitution." *From Thomas Jefferson to Thomas Paine*, July 11, 1789, Nat'l Archives, https://founders.archives.gov/documents/Jefferson/01-15-02-0259 (last visited May 7, 2026).[8] Indeed, one of the grievances that the Declaration of Independence levied against King George III was the deprivation, "in many cases, of the benefits of Trial by Jury." *The Declaration of Independence* (US 1776). And once

---

[7] The National Archives' Editorial Note explains that this letter was part of a series of letters written by John Adams and published in the *Boston Gazette* under the pseudonym "Clarendon." *Clarendon to William Pym [Editorial Note]*, Nat'l Archives, https://founders.archives.gov/documents/Adams/06-01-02-0063-0001 (last visited May 7, 2026).

[8] When we are trying to assess the scope and nature of the right as it was understood at common law, sources of this sort are relevant data points to determine the understanding of the public at large. Cf., e.g., *Olevik*, 302 Ga. at 238 ("[C]onsidering what the framers of our Constitution understood the words they selected to mean can be a useful data point in determining what the words meant to the public at large.").

independence was won, this State, and the United States, included the right to trial by jury in our respective Constitutions. See Ga. Const. of 1777, Art. LXI ("Freedom of the press, and trial by jury, to remain inviolate *forever*."), US Const. Amend. VII. ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved[.]").

In September of 1846, just seven months after the first session of this Court was held, we wrote that the provision of Magna Carta that guaranteed the right to trial by jury "deserves to be written in letters of gold; and is justly esteemed an inestimable privilege in all civilized countries." *Craig*, 1 Ga. at 546. Two years later, we described the right to trial by jury in similar terms:

> In England, it has long been esteemed the great bulwark and safeguard, both of civil rights and of political freedom. It is incorporated prominently into *Magna Charta*. Our ancestors, when they removed to this country, brought this admirable system with them, as their *birth right* and inheritance. And for greater security, have had a guarantee for its preservation inserted, not only in the Federal, but in all their State Constitutions. So sensible were they of its value, that when this right was abridged by the British Parliament, the Congress of 1774 declared, (see the 5th of their resolutions,) "that the respective colonies are entitled to the Common Law of England, and more especially to the great and inestimable principle of being tried by their *peers* of the vicinity, according to the course of that law."

*Flint River Steamboat Co. v. Foster*, 5 Ga. 194, 205 (1848). See also *Tift v. Griffin*, 5 Ga. 185, 188 (1848) ("The right came with

the colonists. It was derived from *Magna Charta*. It was their birth right."). The Court in *Flint River Steamboat Co.* went on: trial by jury "is one of the great elements, the greatest characteristic of free government. That it is the school in which the republican learns to weigh facts, to balance arguments …. That it is, in fact, the school where the man is educated into the citizen." 5 Ga. at 206. This Court viewed trial by jury as "the true popular element of the judiciary" that "saves the administrators of justice from that isolation from the people, which is the first step toward secret proceedings and arbitrary tribunals[.]" Id. Thus, as was stated by this Court in 1846, and as is true today: "Far be it from us to wish to curtail or abridge the right of trial by jury, believing, as we do, with the great commentator on the common law: that the more it is searched into and understood, the more it is sure to be valued." *Craig*, 1 Ga. at 546.[9]

(ii) *Defining the right to trial by jury as merely a "procedural right" would undermine the historical importance of the right.*

Our long recognition that the right to trial by jury is fundamental to our system of government provides the backdrop against which we evaluate the current scope of our constitutional right to trial by jury. As a general matter, the importance the right historically has been understood to have appears incompatible with the view that it is, nonetheless, a mere "procedural right" to have a jury decide questions of fact without any obligation that the jury's findings be given legal effect. If the jury trial right guaranteed only that 12 people sit in a box during

---

[9] The Court in *Craig* was likely referring to 3 William Blackstone, *Commentaries* \*350 (discussing trial by jury and stating "the more it is searched into and understood, the more it is sure to be valued").

26

trial and make decisions that a statute then nullifies — as the defendants would have it — there would be little reason to celebrate it. The reverential terms that both the founding generation and this Court used to describe the right to trial by jury provide a strong signal that our Constitution's command that the right to trial by jury shall remain "inviolate" means that the legislature is necessarily limited (in some meaningful way) in its ability to restrict that right. Cf. *Watts v. Lester E. Cox Med. Ctrs.*, 376 SW3d 633, 637–46 (Mo. 2012) ("[S]tatutory limits on … damages directly curtail the individual right to one of the most significant constitutional roles performed by the jury — the determination of damages. The argument that [a statutory cap on noneconomic damages] does not interfere with the right to trial by jury because the jury had a practically meaningless opportunity to assess damages simply pays lip service to the form of the jury but robs it of its function." (quotation marks omitted)); *Moore v. Mobile Infirmary Ass'n*, 592 So2d 156, 159–65 (Ala. 1991) ("Because the statute caps the jury's verdict automatically and absolutely, the jury's function, to the extent the verdict exceeds the damages ceiling, assumes *less* than an advisory status."); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 655 (1989) ("Respondents essentially are saying that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment. Such an argument pays lip service to the form of the jury but robs the institution of its function.").

And a closer look at the common law history of the right supports the idea that the jury trial right is a right of substance, not mere procedure. For instance, at common law, juries' determinations of damages were not readily disturbed. In *Lord Townsend v. Hughes*, 86 Eng. Rep. 994 (C.P. 1676), the plaintiff brought an action for slander ("*scandalum magnatum*"), and the

27

jury awarded the plaintiff £4,000. Id. at 994. The defendant moved for a new trial principally on the grounds that the damages were excessive. See id. Chief Justice North said that "in civil actions the plaintiff is to recover by way of compensation for the damages he hath sustained, and the jury are the proper judges thereof." Id. (emphasis omitted). And "as a Judge he could not tell what value to set upon the honour of the plaintiff; the jury have given four thousand pounds, and therefore he could neither lessen the sum or grant a new trial, especially since by the law the jury are judges of the damages: and it would be very inconvenient to examine upon what account they gave their verdict[.]" Id. at 994–95. Justice Adkins disagreed with the majority and argued that a new trial should be granted, but he acknowledged that "it is true, [the court] cannot lessen the damages, but if they are too great the Court may grant a new trial." Id. at 995. Thus, while recognizing the power of the court to grant a new trial for excessive damages,[10] Justice Adkins agreed that once the jury

---

[10] The Georgia Constitution expressly confers Georgia courts with the specific power to grant a new trial, so that power is not contradictory to the right to trial by jury. See Ga. Const. of 1983, Art. VI, Sec. I, Par. IV ("Each superior court, state court, and other courts of record and the state-wide business court may grant new trials on legal grounds."). See also OCGA § 51-12-12.

Further, judicial remittitur (the power to condition denial of a new trial on the plaintiff accepting a reduced damages award in an amount determined by the trial judge) is inherently different from statutory damages caps. In discussing that difference, we explained in *Taylor*:

> Unlike judicial remittitur, which involves judges weighing evidence and is authorized only where the "'jury's award of damages is clearly so ... excessive as to any party as to be inconsistent with the preponderance of the evidence,'" damages caps "are automatically triggered when a damages award exceeds the threshold amount." *Nestlehutt*, 286 Ga. at 737–38

determined damages, the court was powerless to adjust that award. See also *Beardmore v. Carrington*, 95 Eng. Rep. 790, 793 (1764) ("[T]here is not one single case (that is law) in all the books to be found, where the Court has granted a new trial for excessive damages in actions for torts. … We desire to be understood that this Court does not say, or lay down any rule that there never can happen a case of such excessive damages in tort where the Court may not grant a new trial; but in that case the damages must be monstrous and enormous indeed, and such as all mankind must be ready to exclaim against, at first blush."); 2 Edward Coke, *The First Part of the Institutes for the Laws of England* § 257a (19th ed. 1832) (defining "damages" recoverable for unlawful entry onto land as "recompense that is given by the jury to the plaintiff or defendant, for the wrong the defendant has done unto him" (cleaned up)).

Moreover, we have found nothing in the history of the jury trial right that expressly limits the constitutional right in the way the defendants view it. The historical allocation of questions of fact to the jury, and questions of law to the judge, says nothing about whether the legislature can nullify or materially limit certain findings of fact made by the jury. And, looking again to Blackstone's writings, it is true that in his *Commentaries*

(quoting OCGA § 51-12-12 (b)). These caps do not require judges to weigh the evidence or other circumstances of the individual cases. Instead, the caps apply to all damages awards that fall under the statutorily-prescribed parameters.

316 Ga. at 83 (citation modified). See also generally *Rockdale Hosp., LLC v. Evans*, 306 Ga. 847, 851 (2019) (explaining that under OCGA § 51-12-12 "the trial court is authorized to review an award and to determine whether the damages awarded were within the range authorized by a preponderance of the evidence," whereas "appellate review is confined to the question of whether the trial court abused its discretion in deciding the motion for new trial on this ground").

regarding the right to trial by jury, Blackstone focused primarily on the procedural aspects and structural significance of the right, including the role the jury played in deciding facts. See 3 William Blackstone, *Commentaries* *349–67, 372–85; id. at *352 ("With regard to the *ordinary* trial by jury in civil cases, I shall pursue the same method in considering it, that I set out with in explaining the nature of prosecuting actions in general, viz. by following the order and course of the proceedings themselves[.]"); id. at *361 (referring to juries as "judges of fact"). See also *Horton*, 359 Or. at 236 ("In describing the attributes of the right, Blackstone focused solely on the procedures associated with jury trials. … [H]e praised not only the value of having neutral jurors decide the facts but also the procedural rights that accompany a jury trial, such as the right to cross-examination and the right to have witnesses testify under oath in open court."). But Blackstone's focus on procedural aspects of the jury right does not mean that the right is limited to those procedural aspects. And nothing in Blackstone's *Commentaries* regarding the right to trial by jury expressly stated that the right to trial by jury was limited to the right to have juries decide facts or to the procedural aspects of the jury trial right. Rather, Blackstone stated:

> Here therefore a competent number of sensible and upright jurymen, chosen by lot from among those of the middle rank, will be found the best investigators of truth, and the surest guardians of public justice. For the most powerful individual in the state will be cautious of committing any flagrant invasion of another's right, when he knows that the fact of his oppression must be examined and decided by twelve indifferent men, not appointed till the hour of trial; *and that, when once the fact is ascertained, the law must of course redress it*. This therefore preserves in

30

the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens.

3 William Blackstone, *Commentaries* *380 (emphasis added).

The Supreme Court of Oregon addressed this issue regarding its own Constitution's right to trial by jury. See *Horton*, 359 Or. at 226–50. The Oregon Constitution provides, "[i]n all civil cases the right of Trial by Jury shall remain inviolate." Or. Const. Art. I, Sec. 17. The Oregon court, when evaluating this history as applied to its own state's constitutional right to trial by jury, discounted this statement by Blackstone as "reflect[ing] Blackstone's view of the way that the law, announced by parliament and the common-law courts, worked. It did not reflect an understanding that the jury's fact-finding ability imposed a substantive limitation on parliament or common-law courts' authority to announce legal principles that guide and limit the jury's fact-finding function." *Horton*, 359 Or. at 238, 243 (holding that the Oregon Constitution's right to trial by jury does not "limit[] the legislature's authority to define, as a matter of law, the substantive elements of a cause of action or the extent to which damages will be available in that action").

To the extent that the Oregon court, in characterizing this statement by Blackstone, was acknowledging the critical differences between colonial England and America, we agree. But it is *because* of those differences that we cannot simply transpose the lack of substantive limitations on Parliament's authority to the legal system of this state. Under the Georgia Constitution, our state has a different structure of government than Blackstone-era England, and our state has a specific constitutionalized jury trial right. Blackstone was not writing to explain the constitutional

31

system of this State. "In England, of course, Parliament was historically supreme in the sense that no 'higher law' limited the scope of legislative action or provided mechanisms for placing legally enforceable limits upon it in specific instances; the power of American legislative bodies, by contrast, is subject to the overriding dictates of the Constitution and the obligations that it authorizes." *United States v. Winstar Corp.*, 518 US 839, 872 (1996). See also *Aycock v. Martin*, 37 Ga. 124, 161 (1867) (Harris, J., concurring) ("Can anything be more unlike than a parliament asserting a supreme power and its capacity to do whatever is possible, and the subordination of the other departments to its will, and a congress of the United States, with *limited* powers clearly enumerated, delegated as trusts by the people of the separate States, or of a State legislature, under a State constitution, limited in its powers, first by the constitution of the United States, by the State constitution in the distribution of powers, and then by fundamental principles enumerated in bill of rights, and other fundamental principles so axiomatic and indisputable as not to require specification?").

In *Flint River Steamboat Co.*, this Court explained that the framers of our constitutions included the right to trial by jury in our constitutions to ensure "greater security" of the right. 5 Ga. at 205 ("Our ancestors, when they removed to this country, brought this admirable system with them, as their *birth right* and inheritance. And for *greater security*, have had a guarantee for its preservation inserted, not only in the Federal, but in all their State Constitutions[.]" (second emphasis added)). The "greater security" to which this Court was referring was that the Georgia Constitution's command that the right to trial by jury shall remain "inviolate" necessarily means that the legislature may not legislate in a manner inconsistent with that right. And in outlining the General Assembly's powers, our Constitution

expressly subordinates the General Assembly's legislative power to the dictates of the Constitution. See Ga. Const. of 1983, Art. III, Sec. VI, Par. I. ("The General Assembly shall have the power to make all laws not inconsistent with this Constitution, and not repugnant to the Constitution of the United States, which it shall deem necessary and proper for the welfare of the state."). See *Nestlehutt*, 286 Ga. at 736 ("Though we agree with the general principle … that the Legislature has authority to modify or abrogate the common law, we do not agree with the notion that this general authority empowers the Legislature to abrogate constitutional rights that may inhere in common law causes of action."). In contrast, the English right to trial by jury was not a limitation on Parliament. See 1 William Blackstone, *Commentaries on the Laws of England* \*156 (1765) ("The power and jurisdiction of parliament, says sir Edward Coke, is so transcendent and absolute, that it cannot be confined, either for causes or persons, within any bounds. … It can, in short, do every thing that is not naturally impossible; and therefore some have not scrupled to call [its] power, by a figure rather too bold, the omnipotence of parliament. True it is, that what they do, no authority on earth can undo."); id. at \*157 ("So long therefore as the English constitution lasts, we may venture to affirm, that the power of parliament is absolute and without control.").[11]

---

[11] Although we do not mean to suggest that England's parliamentary system has remained fully static since the Founding era, we note that Parliament is presently considering eliminating jury trials in England and Wales for offenses that carry a likely sentence of less than three years and giving judges the power to order complex or lengthy cases (e.g., certain fraud cases) be tried without a jury. See Paul Seddon & Joshua Nevett, *Jury restriction plan clears first hurdle despite Labour dissent*, BBC (Mar. 10, 2026), https://www.bbc.com/news/articles/cpw0eg9q7kwo; *Courts and Tribunals Bill:*

And although Blackstone focused on the importance of the right in curtailing the power of judges specifically, others including Thomas Jefferson and John Adams spoke in broader terms about checking the power of the "government" or protecting against "wanton, cruel power." So the right to trial by jury was viewed by at least some American founders as guarding against abuse of power by government actors generally, and trial by jury was seen as checking abuse of power by judges or legislators.

Accordingly, because the right to a jury trial is a "principal bulwark of English and American liberties," and history supports the view that the right was substantive in part, we are unpersuaded that *Nestlehutt* was wrongly decided merely because much of the historical focus has been on the procedural aspects of the right or on the allocation of rules between judge and jury. Cf. *Boon v. State*, 1 Ga. 618, 619 (1846) ("[W]hile we admit it is in the power of assembly to pass any act regulating merely the mode of trial by jury — provided that, in doing so, they do not destroy, or materially impair, the right — we should feel constrained to disregard any act which would deprive the citizen of the benefit of the security to which we have just alluded[.]").

The defendants also point to Alexander Hamilton's statements in *The Federalist No. 83* for the proposition that the legislature could alter the common law through legislation. Hamilton wrote, "It is evident that [the right to a civil jury trial] can have no influence upon the legislature, in regard to the AMOUNT of taxes to be laid, to the OBJECTS upon which they

---

*factsheet*, Gov.UK (last updated Mar. 9, 2026), https://www.gov.uk/government/publications/courts-and-tribunals-bill/courts-and-tribunals-bill-factsheet; Courts and Tribunals Bill, 2026-7, HC Bill [5] Part 1, Sec. 1–5, https://bills.parliament.uk/bills/4083 (last visited June 3, 2026) (pending bill).

are to be imposed, or to the RULE by which they are to be apportioned." *The Federalist No. 83.* But this statement is not applicable here; Hamilton wrote it before the Bill of Rights' inclusion of a constitutional right to trial by jury in civil cases in the United States Constitution. Indeed, in the same Federalist Paper, Hamilton wrote, *"[I]f nothing was said in the Constitution on the subject of juries*, the legislature would be at liberty either to adopt that institution or to let it alone." Id. (emphasis added). But the Bill of Rights did not guarantee the right to trial by jury in civil cases until *after* Hamilton made this statement. Legislation cannot contravene the constitution. We see no reason to extrapolate this statement beyond the limited context to which Hamilton applied it.

Thus, the history of the right to trial by jury contains support for the idea that juries' determinations of damages were not readily disturbed, and that the right was not limited to procedural aspects of the jury right. And ample precedent of ours provides similar support. See, e.g., *Pollard v. State*, 148 Ga. 447, 454 (1918) ("We are of the opinion that the constitutional provisions quoted above preserved not merely the form or mode of trial, but the right of trial by jury in all its essential elements as it existed at common law and as it obtained in this State at the date of the adoption of our earliest constitution."); *Boon*, 1 Ga. at 619 ("'[T]rial by jury, as heretofore used,' means something more than a trial merely, by twelve men, regardless of the mode by which they may be selected. It protects the accused against the passage, by the Legislature, of any law which would materially trench upon his rights, or endanger his safety, by depriving him of any of those privileges guaranteed by the common law." (spelling modernized)). Cf. *Hargis v. Dep't of Human Res.*, 272 Ga. 617, 617 (2000) (declining to give a statute removing the right to a jury trial in a paternity suit retroactive effect, because "[t]he

right to a jury trial is a substantive one"). And although the defendants argue that nothing in the text of the Constitution indicates that the right to trial by jury has a substantive component, the converse is also true. Nothing in the text indicates that the right is not substantive — it simply declares that whatever is included within the jury trial right shall remain "inviolate." Ga. Const. of 1983, Art. I, Sec. I, Par. XI(a).

Thus, history and precedent both provide support for *Nestlehutt*'s more substantive view of the jury trial right than is proposed by the defendants. Some of us find this history and precedent sufficiently compelling to conclude that *Nestlehutt* was correct. Some of us are less certain about that. But we all agree on this: the defendants have not shown that *Nestlehutt* was clearly wrongly decided.[12] And nothing has changed since we

[12] The defendants rightly note that in other contexts we have said that plaintiffs asserting a novel construction of the Constitution that would invalidate a statute have the burden to show that the meaning of the Constitution is clear. See *Taylor*, 316 Ga. at 52–53; *Ammons*, 315 Ga. at 163. See also Nels S.D. Peterson, *Principles of Georgia Constitutional Interpretation*, 75 Mercer L. Rev. 1, 41–42 (2023). Although that is part of the burden to establish that a statute is unconstitutional, the burden to establish that a precedent must be overruled is on the party asking to overrule it. See *Stephens*, 321 Ga. at 658 (declining to reconsider precedent where the party seeking such reconsideration "has not established that our precedent … is clearly wrong"); *Ammons*, 315 Ga. at 173 (Pinson, J., concurring) ("Given the deliberate nature of [the precedents at issue], anyone who seeks to overrule them has to marshal much more than mere disagreement with their outcome — to me, they need to show in some way that following them would cause even more serious damage to the rule of law than overruling them would."). And meeting that burden requires more than just showing that it was wrong, but that it was "obviously and harmfully" wrong. *Wasserman,* 320 Ga. at 647 (quotation marks omitted). And here, the history and precedent we recounted above rebuts the defendants' assertion that *Nestlehutt*'s conclusion as to the substantive nature of the right to trial by jury was obviously wrong.

decided *Nestlehutt* other than the makeup of this Court. That alone is not a legitimate reason to reconsider precedent. We thus adhere to *Nestlehutt*'s holding that the right to trial by jury has a substantive component that the legislature may not invade.

(c) *The scope of the right to trial by jury includes at a minimum the right as it existed at common law, and we need not decide today whether the right also extends to all of the ways Georgia used juries as of a later date.*

In recent cases, there has been some discussion as to which point in time should be the focus of the right-to-trial-by-jury analysis — that is, at which point in time did the scope of the inviolate right to trial by jury become fixed? *Nestlehutt* stated that 1798 was the key date for the analysis, pointing to our past precedent that has said so. See *Nestlehutt*, 286 Ga. at 733 ("It is well established that Article I, Section I, Paragraph XI(a) 'guarantees the right to a jury trial only with respect to cases as to which there existed a right to jury trial at common law or by statute at the time of the adoption of the Georgia Constitution in 1798.'" (quoting *Benton*, 258 Ga. at 66 and citing *Tift*, 5 Ga. at 188–89)). *Taylor* also stated that it was "well-settled" that 1798 was the key date. 316 Ga. at 57. While acknowledging that "[i]t [was] not entirely clear" why the Court previously had reached that determination, *Taylor* did not reconsider that issue because "no one … asked us to reconsider our precedents setting the key date at 1798." Id. at 57 n.19 ("The consequence of this well-settled cutoff is significant."). See also *Turner*, 322 Ga. at 131–32 (reiterating the *Nestlehutt* framework for the jury-right analysis with 1798 as the key date). The majority in *Taylor* noted that the provision in the 1798 Constitution contained unique language ("as heretofore used") not present in any other constitution and that the jury trial right provision was omitted from the 1861 and

1865 Constitutions. See 316 Ga. at 56–57 nn.18 & 19. One justice in *Taylor* argued that the correct date should be 1777 (the date of Georgia's first constitution, which also included the jury trial right). See id. at 106–07 (Ellington, J., concurring in part and dissenting in part).

Here, the plaintiffs argue that they would prevail even if the key date was not 1798, as stated in *Nestlehutt*, but instead either 1868 or 1983. But in adhering to *Nestlehutt*, it is not necessary for us to reach the key-date question or even affirmatively confirm whether 1798 is the correct date. *Nestlehutt*'s holding turned on the right to trial by jury as it existed at common law, which Georgia adopted from England as it existed on May 14, 1776. See Oliver H. Prince, *A Digest of the Laws of the State of Georgia* 310 (1822). *Nestlehutt*'s reference to 1798 rather than an earlier date made no difference because there was no indication the constitutional right changed from 1776 to 1798.[13] And because *Nestlehutt*'s holding prevents the cap statute (as interpreted below) from applying as a matter of statutory construction, we need only hold today that the scope of the constitutional right to trial by jury includes, at a minimum, the right to trial by jury as it existed at common law. Whether the scope of the constitutional right to trial by jury also extends to all of the ways that Georgia used juries as of 1798 or even as of some later date is a question we need not and do not decide today.

*Nestlehutt*'s holding that the cap statute's limit on

---

[13] There are no reported decisions from Georgia courts before 1805. See Thomas U.P. Charlton, Esq., *Reports of Cases Argued and Determined in the Superior Court of the Eastern District*, Reprint Ed. (1974). As we observed in *Nestlehutt*, "Because there is only a sparse record of reported Georgia cases prior to the publication of the first volume of the Georgia Reports in 1846, Georgia precedent is of limited utility in ascertaining the extent of the jury trial right as of 1798." 286 Ga. at 733 n.3.

noneconomic damages violated the right to trial by jury as applied to damages for pain and suffering and loss of consortium in medical malpractice actions, see *Nestlehutt*, 286 Ga. at 731, 738, turned on the right to trial by jury as it existed at common law. Specifically, in concluding that medical malpractice claims are encompassed within the constitutional right to trial by jury, the Court looked to English common law and "early American common law," which clearly established the "existence of medical malpractice claims as of the adoption of the Georgia Constitution of 1798." 286 Ga. at 733–34. See also id. at 733 ("[T]he initial step in our analysis must necessarily be an examination of the right to jury trial under late eighteenth century English common law."). The Court looked to early decisions of this Court and the inclusion of medical malpractice in Georgia's earliest Code merely to "bolster[]" that conclusion. Id. at 734. And for its conclusion that juries awarded noneconomic damages in medical malpractice cases, the Court again looked primarily to the common law. Id. at 734–35. See also id. at 735 ("[W]e conclude that at the time of the adoption of our Constitution of 1798, there did exist the common law right to a jury trial for claims involving the negligence of a health care provider, with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury.").

That the scope of the right to trial by jury includes the scope of the right as it existed at common law is a proposition with overwhelming support in our precedent. Much of our precedent analyzing the constitutional right to trial by jury has either looked to the common law to determine whether the Georgia Constitution's right to trial by jury was violated or has stated that the Court looks to the common law to define the scope of the jury trial right. See, e.g., *Bell v. Cronic*, 248 Ga. 457, 458 (1981) ("In construing the provision of the Georgia Constitution which states

39

that the right of trial by jury shall remain inviolate, this court has consistently held that in civil actions the right of a jury trial exists only in those cases where the right existed prior to the first Georgia Constitution, and the Constitution guarantees the continuance of this right unchanged as it existed at common law."); *Jernigan v. Garrett*, 155 Ga. 390, 392 (1923) (stating that a challenge to a child adoption statute on the ground that it violates the constitutional right to trial by jury "would have been without merit" because "[t]he  provision in the constitution relating to a jury trial preserves the right of trial by jury as it was at common law at the time fixed by the adopting act of 1784[,] [a]nd the law in regard to the adoption of children, as it is provided for in our law now, was not known to the common law, and is purely a statutory procedure"); *Pearson v. Wimbish*, 124 Ga. 701, 705–07 (1906) (looking to the common law to determine that a municipal ordinance which provided for a summary trial before a "police court" for drunk and disorderly conduct did not violate the right to trial by jury); id. at 705 ("With striking unanimity [the jury trial provision] and equivalent expressions have been construed to mean that the right of trial by jury as it existed in the colonies prior to the Revolution should be preserved. The privilege was not enlarged, nor was the right extended to instances where summary trial without a jury was authorized and practiced. This construction has been given to the guaranty of jury trial as contained in the first and all subsequent Constitutions of this State. *Flint River Steamboat Co. v. Foster*, 5 Ga. 194 (7). Clearly, then, that Clause of the Constitution … is only preservative of jury trial as it existed when Georgia became an independent state and a part of the United States, except as modified in the present Constitution."); *Stewart v. Sholl*, 99 Ga. 534, 537 (1896) ("The limitations upon [the jury trial] right are to be found in the common law, and except only in so far as it has

been modified by the constitution, it remains of force in this state to the same extent only as it existed at common law. To preserve the right of trial by jury so that it shall remain 'inviolate' is one thing; to extend it to cases in which jury trials were never allowed, according to the ancient practice which prevailed at common law, is entirely a different thing; so that, where jury trials are neither specially enjoined nor prohibited by the constitution of this state, in order to determine whether in a given case a jury trial may be demanded we must have recourse to the common law."); id. at 536–40 (holding that a lien entered by a trial court without the intervention of a jury was not void because "as to suits upon judgments of courts of record, where no defense is filed which calls in question the validity of the judgment, the right of trial by jury does not and has never existed as matter of law"); *Tift*, 5 Ga. at 185–94 (declaring that the "usage" of the right to trial by jury "as heretofore used" "must be according to the course of the Common Law" and holding that a 1796 statute that did not provide for a trial by jury is unconstitutional as applied to the appellant); *Williams v. City Council of Augusta*, 4 Ga. 509, 515–16 (1848) (holding that a city ordinance that regulated the amount of gun powder that retailers could store by levying fines on retailers who stored more than the amount allowed under the ordinance did not violate the right to trial by jury, explaining that "inasmuch as the right of trial by Jury existed in England, and was secured by *magna charta*, and municipal corporations in that country enforced their by-laws by *pecuniary penalties*, *in a summary manner*, and the same right being conferred upon similar corporations in this State, anterior to the adoption of the Constitution, which have been constantly exercised, 'the right of trial by jury, as heretofore used in this State,' previous to the 30th day of May, 1798, has not been violated by the City Council of Augusta, by the imposition of the penalty for a breach of the *local*

41

*police* regulations of that city"). See also *Taylor*, 316 Ga. at 63; *Nestlehutt*, 286 Ga. at 733–35; *Kelley v. Ga. Dep't of Human Res.*, 269 Ga. 384, 384–85 (1998); *Swails v. State*, 263 Ga. 276, 278 (1993); *Hill v. Levenson*, 259 Ga. 395, 396 & n.1 (1989); *Hudson v. Abercrombie*, 258 Ga. 729, 730 (1988); *Clayton v. Deverell*, 257 Ga. 653, 656 (1987); *Dep't of Transp. v. Del-Cook Timber Co., Inc.*, 248 Ga. 734, 742 (1982); *Dep't of Transp. v. Doss*, 238 Ga. 480, 483 (1977), overruled on other grounds by *DeKalb County v. Trustees, Decatur Lodge No. 1602, B. P. O. Elks*, 242 Ga. 707 (1978); *Strange v. Strange*, 222 Ga. 44, 45–47 (1966); *Porter v. Watkins*, 217 Ga. 73, 74 (1961); *Wright v. Davis*, 184 Ga. 846, 852 (1937); *Pollard v. State*, 148 Ga. 447, 450, 454 (1918); *De Lamar v. Dollar*, 128 Ga. 57, 58–61, 65–66 (1907); *Poullian v. Brown*, 80 Ga. 27, 30–31 (1888); *Mahan v. Cavender*, 77 Ga. 118, 120–21 (1886) (one-justice opinion); *Floyd v. Comm'rs of Town of Eatonton*, 14 Ga. 354, 357–58 (1853); *Rouse v. State*, 4 Ga. 136, 145–48 (1848); *Boon*, 1 Ga. at 619–20. *Nestlehutt* was plainly in line with our longstanding precedent in looking to the common law to hold that the cap statute violated the right to trial by jury as applied to the noneconomic damages for the non-wrongful death claims at issue in that case.

The claims at issue in *Nestlehutt* were claims and damages decided by juries at common law. No party argues that any possible alternative date would render those claims outside the scope of the right. And so we can and do reaffirm *Nestlehutt* without considering whether an alternative date might instead apply.

> (d) *Stare decisis also preserves Nestlehutt's claim- and remedy-focused framework for evaluating the substantive scope of the right to trial by jury.*

Our determination to leave undisturbed *Nestlehutt*'s

42

holding that the right to trial by jury is a substantive and not merely procedural right does not itself resolve whether *Nestlehutt*'s specific claim- and remedy-focused framework is the correct framework for construing and applying the right to trial by jury. The defendants do not argue that a different substantive framework should apply and make no specific challenge to this framework beyond their argument that the right is merely procedural. We conclude that, whether or not this specific framework was precisely correct, stare decisis preserves it.

*Nestlehutt*'s framework, at its core, requires us to determine whether the type of underlying claim of liability at issue existed and had a right to trial by jury at common law and whether the damages awarded by the jury were damages determined by juries for that type of claim at that time. See *Nestlehutt*, 286 Ga. at 733–35; *Taylor* 316 Ga. at 57–59; *Turner*, 322 Ga. at 131–32. *Nestlehutt* applied this framework to damages for pain and suffering and loss of consortium in medical malpractice actions and determined "that at the time of the adoption of our Constitution of 1798, there did exist the common law right to a jury trial for claims involving the negligence of a health care provider, with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury." 286 Ga. at 735. And as applied to those claims, *Nestlehutt* held that the cap statute "clearly nullifies the jury's findings of fact regarding damages and thereby undermines the jury's basic function" and therefore violates the constitutional right to trial by jury as applied to the damages in that case. Id. at 735.

*Nestlehutt*'s claim- and remedy-focused framework was the product of applying sound, generally accepted legal principles. *Nestlehutt*'s claim- and remedy-focused framework may not have

been the only way to give effect to the substantive, common-law-based nature of the right given that little of our prior caselaw articulated with precision any specific test. But aside from arguing that the right to trial by jury is merely procedural, the defendants have advanced no alternative framework for effectuating the substantive nature of the right to trial by jury. And *Nestlehutt* established a framework that did exactly that. Particularly given the defendants' failure to meaningfully challenge *Nestlehutt*'s framework, much less identify an obviously sounder alternative construction of the right, we cannot say that the framework it established was wrong or unreasonable, let alone "obviously and harmfully" so. *Wasserman*, 320 Ga. at 647 (quotations marks omitted).

No legal developments since *Nestlehutt* was decided have undermined its claim- and remedy-focused framework. Instead, we have since applied *Nestlehutt*'s framework in one case, see *Taylor*, 316 Ga. at 63–80, and in another case we have directed the Court of Appeals to return a case to the trial court to apply *Nestlehutt*'s framework, see *Turner*, 322 Ga. 129. Indeed, in *Taylor*, we expressly "decline[d] the invitation" of the Attorney General to overrule *Nestlehutt*. See *Taylor*, 316 Ga. at 60 n.20.

The defendants argue that *Nestlehutt*'s framework is unworkable because, as stated in one defense brief, it "t[ies] up significant resources in historical research in order to make a judgment call about whether modern claims and damages sufficiently analogize to common law claims and remedies." But that is not the sort of unworkability that our stare decisis caselaw contemplates. See *Wasserman*, 320 Ga. at 646 (unworkable precedents are "precedents that leave courts without manageable standards to cabin judicial discretion and invite courts to make policy decisions instead of doing law"). In practice, *Nestlehutt*'s

framework may require parties and this Court to expend resources in analyzing the relevant scope of the right to trial by jury at common law, but *Nestlehutt*'s claim- and remedy-focused framework helps to foster the sort of "principled judicial administration" that the workability factor seeks to advance and to prevent the "unbounded discretion" that the workability factor seeks to avert. See id. at 646 n.12 ("[P]roperly applied, this narrow understanding of workability as a question about whether the legal rule in question is susceptible of principled judicial administration or simply a vehicle for unbounded discretion is consistent with the principles that animate stare decisis."). Indeed, the kind of work *Nestlehutt* requires is simply the kind of work that is often required to determine the original public meaning of constitutional provisions. See, e.g., *Elliott*, 305 Ga. 179. See also Nels S.D. Peterson, *Principles of Georgia Constitutional Interpretation*, 75 Mercer L. Rev. 1, 43 (2023) ("As a law clerk of mine once said: 'Originalism is hard, and it makes me tired.' He was not wrong. But originalism is worth doing right — despite the challenge — because it is important."). We once again decline to overrule *Nestlehutt* and its claim- and remedy-focused framework for analyzing constitutional right to trial by jury claims.

3. *As a matter of statutory construction, the cap statute cannot apply at all to a verdict that includes damages to which* Nestlehutt*'s holding applies.*

That brings us to the verdict in this case. The parties offer different takes on how *Nestlehutt*'s holding affects the verdict in this case. In addition to arguing that applying the cap statute's damages cap to wrongful death claims violates the right to trial by jury, the plaintiffs rely on principles of severability and statutory construction to contend that, in the light of *Nestlehutt*,

OCGA § 51-13-1's damages cap is incapable of being applied to the verdict in this case because it includes damages to which that cap may not be applied without violating the right to trial by jury. On the other hand, the defendants contend that, even assuming *Nestlehutt* is good law (and as we just held, it is), the damages cap may still be applied to the part of the verdict here that awards damages for wrongful death. In support of this conclusion, they contend that (1) whether or not severability principles apply, the damages cap may be applied to those damages awarded as part of the jury's verdict, even if it may not be applied to the non-wrongful-death damages to which *Nestlehutt*'s holding applies, and (2) under the analysis required by *Nestlehutt*, the right to trial by jury does not attach to damages awarded for wrongful death.

As an initial matter, severability principles, at least as traditionally applied, do not bear directly on the question of whether OCGA § 51-13-1's cap may be constitutionally applied to the verdict in this case. Those principles tell us how to determine whether, when some portion of a statute has been declared unconstitutional, some other portion of that statute may still be enforced. See, e.g., *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*, 266 Ga. 393, 403–04 (1996); *City Council of Augusta v. Mangelly*, 243 Ga. 358, 363–64 (1979). But that is not the issue the defendants' argument presents. The defendants do not seek to enforce some portion of the cap statute that has not been declared unconstitutional. Indeed, they seek to apply that statute's cap on noneconomic damages, which is the very feature of the statute that *Nestlehutt*'s holding addressed. The defendants' argument instead is that although *Nestlehutt* held that this damages cap could not be constitutionally applied to the jury verdict in that case, which did not involve wrongful death, the cap may be applied to at least the part of the verdict in this

case awarding damages for the wrongful death claim. In other words, the defendants do not seek to apply a different portion of the statute than *Nestlehutt*'s holding addressed; they seek to apply the same statutory provision in circumstances that they contend are materially distinguishable. That argument does not call for a traditional severability analysis, which essentially asks whether the legislature still would have wanted some remaining portion of a statute enforced without the unconstitutional portion. See *Justice Outdoor Displays*, 266 Ga. at 403–04; *Nixon v. State*, 256 Ga. 261, 264 (1986); *Mangelly*, 243 Ga. at 363–64; *Elliott v. State*, 91 Ga. 694, 696–97 (1893).

Instead, addressing the defendants' argument for applying the cap despite *Nestlehutt*'s holding calls for traditional statutory construction. And after doing that construction, we conclude that the cap statute's damages cap is not capable of being applied in a case like this one, where a jury's verdict includes noneconomic damages for a cause of action to which the right to trial by jury applies (the estate's medical malpractice claim for pre-death pain and suffering) — even if that verdict also includes damages for a cause of action to which the right allegedly does not attach (the wrongful death claim that is the subject of the defendants' argument).[14] Here is why.

Start with OCGA § 51-13-1(b), the subsection at issue in this case. That provision states:

> In any verdict returned or judgment entered in a medical malpractice action, including an action for wrongful death, against one or more health care

---

[14] Given this conclusion, we need not and do not decide the defendants' argument that the right to trial by jury does not protect the right to have a jury decide damages for wrongful death.

47

providers, the total amount recoverable by a claimant for noneconomic damages in such action shall be limited to an amount not to exceed $350,000.00, regardless of the number of defendant health care providers against whom the claim is asserted or the number of separate causes of action on which the claim is based.

OCGA § 51-13-1(b). Subsections (c) and (d) are substantially similar, although those sections apply to actions against medical facilities rather than healthcare providers. See OCGA § 51-13-1(c)–(d). As used in this section, a "claimant" is defined as a "person" seeking damages in the medical malpractice action and includes the decedent's estate. OCGA § 51-13-1(a)(1). Importantly, "[a]ll persons" claiming damages "are considered a single claimant" under the statute. Id. And the statute defines "[n]oneconomic damages" as "damages for physical and emotional pain, discomfort, anxiety, hardship, distress, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium, injury to reputation, and all other nonpecuniary losses of any kind or nature." OCGA § 51-13-1(a)(4). "Noneconomic damages" do not include economic damages such as past or future medical expenses or income. See OCGA § 51-13-1(a)(4)(A)–(F). Finally, subsection (e) states that "[i]n applying subsections (b), (c), and (d) of this Code section, the aggregate amount of noneconomic damages recoverable under such subsections shall in no event exceed $1,050,000.00." OCGA § 51-13-1(e).

Putting all of this together, it is clear that OCGA § 51-13-1(b) provides a single operative mechanism for "capping" noneconomic damages: for "any verdict returned or judgment

48

entered," the statute combines all of the possible bases for recovery of noneconomic damages — all claimants and claims for all kinds of noneconomic damages — into one undifferentiated sum called the "total amount recoverable," and then "limit[s]" that single amount to $350,000. In other words, the estate's damages for pre-death pain and suffering and the wrongful death claimants' damages for the noneconomic value of the life of the decedent are lumped together for purposes of the application of the cap. In practical terms, this means that applying the cap to a given verdict requires combining each amount of noneconomic damages awarded — adding up the amounts awarded for each and every cause of action to each and every claimant — and then slicing any recovery over $350,000 off the top of that total amount.

Whether or not there is a constitutional right to a jury trial for a wrongful death claim, applying this statutory cap here to all of the noneconomic damages violates the core holding of *Nestlehutt*, because the pain and suffering damages cannot constitutionally be capped. There is no mechanism in the statute for applying that cap on an individual basis to only certain claimants or causes of action, such as the wrongful death claim in this case. To do so would ignore the plain text of OCGA § 51-13-1(b).

That is the fundamental problem with the defendants' request to apply the cap to the verdict like the one in this case, which includes some noneconomic damages for the estate's pre-death injury claim. Code section 51-13-1(b) requires combining those damages with the wrongful death damages awarded by the jury in the same verdict or judgment, and then capping that "total amount recoverable," a lump sum, at $350,000. But that statutory cap may not be applied to non-wrongful-death damages that are part of that lump sum when doing so would violate the plaintiffs'

49

right to trial by jury. See *Nestlehutt*, 286 Ga. at 731, 738. See also *Turner*, 322 Ga. at 131–32. So, even if the cap could be constitutionally applied to the wrongful death damages were they isolated in their own "verdict returned or judgment entered," see OCGA § 51-13-1(b) — a question we do not reach today and express no opinion on — the cap may not be applied to a verdict or judgment that includes noneconomic damages awarded by a jury for the decedent's pre-death injury.

Now consider the verdict here. The jury awarded the Clarks $2,500,000 in damages for pain and suffering (to April D. Clark, as administrator of Clark's estate) and $29,250,000 in damages for the full value of the decedent's life (to Charles Clark, as the statutory wrongful death plaintiff), totaling $31,750,000.[15] Without taking the right to trial by jury into account, OCGA § 51-13-1(b)'s cap would apply to that total,[16] because by its terms, the statute's cap applies to "any verdict returned or judgment entered," and it operates on (and "limit[s]") the "total amount recoverable by a claimant," which, it makes clear, is the total of all noneconomic damages awarded for all medical malpractice causes of action brought by all parties (whom the statute treats as "a single claimant" for purposes of applying the cap). So, to apply the cap, the trial court would "limit" the $31,750,000

---

[15] Economic damages for medical expenses were also awarded but are not relevant to this discussion.

[16] This assumes that no economic damages (such as past or future wages, earning capacity, or income) are included in the wrongful death damages award. Any economic damages included in the wrongful death award would not be aggregated or limited under the statute. See OCGA § 51-13-1(4)(A)–(F). The parties appear to have assumed on appeal that the entirety of the wrongful death award represents only noneconomic damages. It is unclear whether that is necessarily so, but ultimately we need not resolve that question.

awarded for both wrongful death and pain and suffering damages to $350,000. However, the trial court may not apply that cap in the light of *Nestlehutt*, because applying the statute would also limit the $2,500,000 awarded for pain and suffering — damages to which *Nestlehutt* held that the right to trial by jury attaches — and that would violate the Clarks' right to trial by jury under the Georgia Constitution. So in this case, even assuming that the statute's cap could constitutionally be applied to damages awarded by a jury for wrongful death, applying the aggregate cap to the lump sum of noneconomic damages, as the statute plainly requires, would necessarily limit some damages awarded by a jury in violation of the right to trial by jury.

To avoid violating the right to trial by jury in this way, the defendants suggest that the statute's damages cap may instead be applied to a subset of damages to which the right to trial by jury does not attach (in their view, the wrongful death damages). Here, for example, that would mean capping the noneconomic portion of the $29,250,000 awarded for wrongful death at $350,000 but leaving alone the $2,500,000 awarded for pain and suffering. But the statute as written offers no procedure for achieving this kind of bifurcated application of its cap. For one thing, applying the statute like this would treat the wrongful death plaintiff and the estate as different claimants, rather than "a single claimant," directly contradicting the express statutory language that defines all claimants in a medical malpractice action as a single claimant to which the statute's cap applies. See OCGA § 51-13-1(a)(1). For another, it would contravene the statutory text which "limit[s]" a single, undifferentiated "total amount recoverable" "[i]n any verdict returned or judgment entered" in a medical malpractice action to $350,000, regardless of the number of claimants or "separate causes of action." See OCGA § 51-13-1(b). In other words, the statute cannot be applied

51

in this way — carving up a verdict and applying the cap to a subset of it — unless we disregard what the statute actually says and how it actually works. That exceeds our power and role. See *State v. Fielden*, 280 Ga. 444, 448 (2006) ("[U]nder our system of separation of powers this Court does not have the authority to rewrite statutes."). See also *Turner v. Ga. River Network*, 297 Ga. 306, 308–09 (2015) ("The doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature. We can not add a line to the law." (quotation marks omitted)).[17]

In sum, the cap statute's damages cap applies using a single operative mechanism: combine all the noneconomic damages awarded to all the parties into a single number and then limit that number to $350,000. No statutory text permits doing so only for some parties and some damages. So, in a case like this — where noneconomic damages to which the right to trial by jury applies are awarded as part of a jury's verdict in a medical malpractice action — there is simply no way to apply the statute's cap on noneconomic damages as written without violating the right to trial by jury. And the defendants' proposed revisions to the statute to permit such operation would require us to rewrite statutory text in excess of our constitutional power. So the cap statute's damages cap may not be constitutionally applied to the verdict in this case.

---

[17] The defendants point out that *Nestlehutt* was an as-applied challenge to the cap statute's damages cap. True, but as we have explained, the aggregate damages in this case (to which that cap applies) include the *same* kind of damages at issue in *Nestlehutt*. So this case presents the same constitutional problem as the one in *Nestlehutt*, not a different set of circumstances from which *Nestlehutt*'s holding might be distinguished.

Thus, we vacate the trial court's order granting the doctors' motion to remit and amend the judgment and applying the cap statute to reduce the wrongful death award in this case to $350,000. Because we conclude that in the light of *Nestlehutt* the plain text of the cap statute prevents the statute's limit on noneconomic damages from being applied in this case, we need not and do not address the defendants' other constitutional arguments or the plaintiffs' argument that applying the cap statute's damages cap to wrongful death claims violates the right to trial by jury.

*Case No. S26X0350*

III. *The Doctors' Cross-Appeal*

On cross-appeal, the doctors argue that the trial court erred by (1) using a special verdict form that did not allow for distinct decisions regarding liability and apportionment on the distinct claims; (2) charging the jury on aggravation of preexisting conditions; and (3) denying the doctors' motion for new trial on the general grounds by refusing to exercise discretion and weigh the evidence. We reject these claims. Our holding that the trial court erred in applying the cap statute means that the trial court now needs to resolve on remand one additional argument the doctors raised below.

A. *There is no cause for reversal for the trial court's use of a verdict form that did not allow for distinct decisions regarding liability and apportionment on the distinct claims.*

The doctors argue that the trial court erred by using a verdict form that did not allow for distinct decisions regarding liability and apportionment on the estate's claim for pain and suffering and the wrongful death claim. This argument fails.

53

During the charge conference, the doctors requested that the verdict form allow the jury to make separate findings of liability and fault for the Clarks' claims (i.e., the estate's claim for pain and suffering and the wrongful death claim). The trial court decided to "leave the apportionment of fault as one item" but separate the damages. The doctors objected. The verdict form ultimately given to the jury permitted a choice between finding for or against the doctors, without separating the estate's claim from the wrongful death claim. The verdict form also permitted allocation of fault among the various potential tortfeasors without any separation for apportionment of fault between the estate's claim and the wrongful death claim. The doctors renewed their objection to the jury verdict form after the jury was charged.

The jury returned a verdict in the Clarks' favor. The jury then allocated fault: 40 percent to Dr. Leigh and OB/GYN Specialists, LLP, 35 percent to Dr. Shirley and OB/GYN Specialists, LLP, 0 percent to Dr. Williams, 15 percent to Dr. Woodyard, and 10 percent to Coliseum Medical Center, LLC. (Dr. Williams, Dr. Woodyard, and Coliseum Medical Center, LLC are nonparties for purposes of this appeal.) The jury awarded $29,250,000 for the full value of Clark's life, $2,500,000 for Clark's pain and suffering, and $1,715,716 for medical expenses.[18] The doctors again renewed their objection to the special verdict form after the jury returned its verdict. The trial court entered judgment on the verdict, apportioning damages according to the jury's fault allocation and distinguishing between the estate's award for pain and suffering and Charles's award for wrongful

---

[18] The jury's awards for pain and suffering and medical expenses were apportioned pursuant to the jury's allocation of fault.

death.[19]

The doctors timely filed a motion for new trial, which was later amended, in which the doctors challenged the special verdict form. After a hearing, the trial court denied the doctors' motion for new trial. In that order, the trial court rejected the doctors' argument "that given the chronology of medical care at issue, the verdict form needed to have separate and distinct 'apportionment' allocations for the claims for pain and suffering, on the one hand, and the wrongful death claims, on the other." The trial court reasoned that (1) there is a strong presumption in upholding verdicts and the evidence supported the jury's allocation of fault, (2) the plain language of OCGA § 51-12-33(b) (the apportionment statute) requires apportionment in a given action as to the total amount of damages awarded, and not per claim, (3) the doctors cited no precedent for their request to have separated the distinct claims on the verdict form, and (4) the doctors' remedy if there had been an error would not be an entirely new trial, but a limited trial on the limited issue of alleged error.

Under OCGA § 9-11-49,[20] the trial court "may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact." OCGA § 9-11-49(a). If a special verdict form is given, the trial court "shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue." Id. On appeal, "[i]n deciding whether a

---

[19] The judgment was amended to apply OCGA § 51-13-1(b)'s limit on noneconomic damages to the wrongful death damages, but the amended judgment also apportioned damages according to the jury's fault allocation and distinguished between the estate's recovery for pain and suffering and Charles's recovery for wrongful death.

[20] We assume without deciding that this statute applies, as the doctors argue.

verdict form accurately presented the law and properly guided the jury, we review the form's language in conjunction with the rest of the trial court's jury instructions." *Rowland v. State*, 306 Ga. 59, 67–68 (2019). See also *Mayo v. State*, 319 Ga. 34, 41 (2024) (noting "the presumption that qualified jurors, in the absence of *clear* evidence to the contrary, followed the instructions of the trial court" (quotation marks omitted)). This Court has reversed a jury verdict issued upon a special verdict form when the verdict form and the accompanying instructions "were not adequately crafted to elicit a decision on the issues before the court." *Glisson v. Glisson*, 265 Ga. 239, 240 (1995).

Here, when explaining the verdict form to the jury, the trial court instructed the jury that it "shall consider the fault of all persons or entities whose negligence contributed to the injury or damage." And the ultimate verdict form allowed for apportionment of fault among each potential tortfeasor. So any jury decisions as to liability and apportionment for particular claims were inherently included in the ultimate apportionment decision made by the jury. The jury was instructed to consider the fault of each potential tortfeasor, and any distinction between whether a tortfeasor should be liable for Clark's pain and suffering, or her death, or both (and if so, for what apportionment per claim), would have been reflected in the ultimate apportionment determination made by the jury. Cf. *Hewitt Assocs., LLC v. Rollins, Inc.*, 308 Ga. App. 848, 852 (2011) (holding that the trial court did not abuse its discretion by refusing to use a special verdict form requiring the jury to make a specific finding as to the date that the plaintiff should have known of the breach of contract, and "because the trial court charged the jury on [the statute of] limitations defense," there was

56

no basis for the contention that the jury ignored that issue).[21]

The doctors point to *Glisson*, 265 Ga. 239, in support of their argument that the verdict form was "not adequately crafted to elicit a decision on the issues before the court." Id. at 240. But *Glisson* does not apply here. In *Glisson*, the appellee had contended that he did not sign a deed, and that if he did, he was induced to do so by fraud, but the only question on the jury form was whether the appellee executed the deed. See id. The Court held that the "verdict form and the accompanying instructions, which called for the jury to decide mixed questions of law and fact, were not adequately crafted to elicit a decision on the issues before the court." Id. *Glisson* thus involved a key issue — fraud — that was missing from the verdict form. No key issue was missing here.[22]

---

[21] *Hewitt Associates, LLC* and other Court of Appeals cases have applied an abuse of discretion standard when reviewing a trial court's decision to use a special verdict form. See 308 Ga. App. at 852. See also, e.g., *R.C. Acres, Inc. v. Cambridge Faire Props., LLC*, 331 Ga. App. 762, 764 (2015). Our limited precedent on this issue does not appear to have resolved whether that is the correct standard of review. In any event, we see no error whether the standard is abuse of discretion or de novo.

[22] The doctors also point to two Court of Appeals opinions — *R.C. Acres, Inc.*, 331 Ga. App. 762, and *Hartman v. Shallowford Community Hospital, Inc.*, 219 Ga. App. 498, 500 (2011) — but those opinions do not apply here and in any event are not binding on this Court.

*R.C. Acres* involved "the location and extent of an easement of access to real property[] and alleged damages as a result of interference with the easement." 331 Ga. App. at 762. The special verdict form submitted to the jury addressed the original and ultimate locations of the easement but did not address any intermediate locations of the easement. Id. at 763–64. The Court of Appeals concluded that "[t]he trial court, in formulating the special verdict form, in essence removed from the jury's consideration the issue of any intermediate locations of the easement." Id. at 766. And the Court of Appeals

B.  *The trial court did not err by charging the jury on aggravation of preexisting conditions.*

The doctors also argue that the trial court erred by instructing the jury that it could award damages for the aggravation of a preexisting condition. The doctors' argument fails.

The Clarks' arguments at trial focused on the negligent treatment following Clark's initial surgery and bowel perforation — not negligence regarding the initial surgery itself. As such, in their requests to charge and during the charge conference, the Clarks asked for a jury charge on the aggravation of preexisting conditions, pointing to the bowel injury resulting from Clark's initial surgery, and arguing that Dr. Leigh's and Dr. Shirley's subsequent "failure to diagnose and treat it exacerbated it." The doctors objected at the charge conference on the grounds that any failure by the doctors to timely treat Clark's perforated bowel did not constitute aggravation of a preexisting condition. The trial

held that "[b]ecause some evidence was presented at trial that the easement was relocated by agreement of the parties to several different routes during the period in question, the trial court abused its discretion in refusing to submit this disputed question of fact to the jury[.]" Id. at 764. So like *Glisson* (and unlike this case), *R.C. Acres* involved a special verdict form that was missing a key issue under the facts of the case. See id. ("A major issue at trial was whether the easement was relocated by agreement between the parties or their predecessors in title.").

*Hartman* held that the use of a verdict form that "did not provide for recovery of general pain and suffering damages" in a medical malpractice action "constituted substantial and harmful error as a matter of law." 219 Ga. App. at 499–500. But in *Hartman*, the verdict form fully prevented the jury from awarding general pain and suffering damages — a key issue in the case. See id. at 498–500. Whereas here, no key issue was missing from the verdict form.

58

court eventually instructed the jury on the role of preexisting conditions as part of its charges on proximate causation:

> There can be no recovery for any injury or disability that was not proximally caused by a Defendant's negligence. However, if you find that the Plaintiff already had an injury or preexisting condition prior to the time of the malpractice alleged but that the malpractice exacerbated her condition, or made it worse or more long lasting, then Plaintiff is entitled to recover damages to the extent that her condition was worsened or prolonged. The Defendants take … the Plaintiff as they find her and the fact that the Plaintiff has already had a preexisting condition and may have been more vulnerable or susceptible to injury does not relieve the Defendants from liability for any aggravation of that condition.

Relatedly, the trial court also instructed the jury:

> No Plaintiff may recover for injuries or disabilities that are not connected with the act or omissions of the Defendant in this case. There can be no recovery for a particular Plaintiff for any injury or disability that was not proximally caused by the incident in question. If you should find that at the time of the incident April S. Clark had any physical condition, ailment, or disease that was becoming apparent or was dormant and if you should find that Ms. Clark received an injury and/or dies as a result of the negligence of one or more of the Defendants and that her injury and/or death resulted from an aggravation of a condition already pending, then Plaintiffs could recover damages against the

negligent Defendant or Defendants for aggravation
of Ms. Clark's preexisting condition.

The doctors renewed their objection to the charge as given.

"A judge presiding over a civil trial should charge the jury on only the legal issues raised by the complaint and answer, adjusted to the evidence introduced at trial." *Se. Pain Specialists, P.C. v. Brown*, 303 Ga. 265, 270 (2018). "It is a question of law whether the evidence presented is sufficient to authorize the giving of a particular charge." *Morris v. State*, 301 Ga. 702, 705 (2017) (quotation marks omitted). See also *Brown*, 303 Ga. at 270–71 (same). And "[t]here need be only slight evidence supporting the theory of the charge to authorize a requested jury instruction." *Daly v. Berryhill*, 308 Ga. 831, 833 (2020). See also *Brown*, 303 Ga. at 270–71. "In reviewing a challenge to the trial court's jury instruction, we view the charge as a whole to determine whether the jury was fully and fairly instructed on the law of the case." *Morris*, 301 Ga. at 705 (quotation marks omitted).

"In the tort context, proximate causation includes all of the natural and probable consequences of the tortfeasor's negligence, unless there is a sufficient and independent intervening cause. Moreover, tortfeasors take their victims as they find them." *Cowart v. Widener*, 287 Ga. 622, 627–28 (2010) (citations omitted). "A negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent." *Geary v. Estate of Tapley,* 373 Ga. App. 561, 566 (2024) (quotation marks omitted).

The Court of Appeals has held that preexisting condition charges were authorized in two recent cases with similar facts to this case. See *United Obstetrics & Gynecology, P.C. v. Robinson*,

376 Ga. App. 198, 201 (2025) (holding that a preexisting condition charge was authorized by the evidence where a pregnant woman had various pregnancy risk factors and had been treated for a urinary tract infection multiple times, such that "the jury could have found that the twins' condition of being housed in a fragile, infected, and compromised environment was a 'preexisting condition' that made them more susceptible to injury, and that the twins were injured by [the defendant doctor's] negligence" which aggravated that condition and led to the twins' deaths); *Geary,* 373 Ga. App. at 565 (holding that the trial court did not err in giving a preexisting condition charge where the decedent suffered a bladder perforation in a surgery performed by the defendant and the plaintiff's allegations focused on the defendant's failure "to perform a cystogram that would have revealed the size and nature of the perforation and … his failing to repair the perforation").

Here, the trial court's instruction was a correct statement of the law, because the bowel perforation can serve as a preexisting injury that the doctors aggravated in their post-surgery negligence. Contrary to the doctors' assertion, such a charge in this case is not inconsistent with our precedent.

The doctors rely on *Bray v. Latham*, 81 Ga. 640 (1888), and *City of Atlanta v. Hampton*, 139 Ga. 389 (1913), for their argument that a preexisting condition must be "some other infirmity which predated the tort." *Bray* involved a suit by a tenant and his wife against their landlord following a fire; the plaintiffs alleged that the landlord had caused the fire and that the "fright and exertion" from the fire caused the wife to be "permanently injured in health and strength." 81 Ga. at 641. The Court criticized a jury instruction given by the trial court that the plaintiffs could not recover "to the extent that [prior] sickness or

61

disorder contributed to her unsound condition after the fire." Id. at 644. The Court explained that this instruction improperly treated previous ill health "as contributory wrong." Id. The Court clarified that "[w]here the subject of a tort is already diseased, the question should be how much, if any, the tort contributed to aggravate or protract the disorder." Id. And, the Court stated, "[t]o cause sickness wrongfully, or to aggravate or protract it, is an injury to health for which damages are recoverable." Id.

Similarly, *Hampton* involved a suit against the City of Atlanta in which the plaintiff alleged that she fell and was injured after stepping on a broken water meter cap on a sidewalk in the city. See 139 Ga. at 390. The trial court instructed the jury that if they find that the plaintiff "was laboring under an infirmity of which she was ignorant," and if the injury she received from falling "aggravated the existing infirmity, … the recovery in that case would be to the extent you find the infirmity was aggravated by the injury." Id. at 393. The Court held that "[t]he evidence authorized the charge, and it was not error to give it[,]" explaining that "[a]lthough a plaintiff may contend that the bad condition of her health after an injury is entirely due to the tort causing such injury, this would not preclude her from recovering if the jury should believe from the evidence that her subsequent condition was not entirely due to the injury, but that such injury aggravated some preexisting infirmity." Id.

Contrary to the doctors' assertion, *Bray* and *Hampton* simply affirmed the idea that a plaintiff can recover for the aggravation of a preexisting injury. Nothing in those cases requires a preexisting condition to be entirely unrelated to the negligence at issue. As such, the doctors' reliance on *Bray* and *Hampton* is misplaced.

The doctors also point to a number of Court of Appeals

cases as "finding preexisting conditions only where the malady fully predated the events of the underlying tort." See *Atlantic Star Foods, LLC v. Burwell*, 368 Ga. App. 79, 83–84 (2023) (upholding preexisting condition jury charge where the defense suggested that an allergic reaction at issue may have merely aggravated the plaintiff's existing medical condition of low blood potassium); *Safeway Ins. Co. v. Hanks*, 323 Ga. App. 728, 730–31 (2013) (upholding preexisting condition jury charge where plaintiff suing for injuries from a car accident had been involved in a similar car accident from which he suffered similar injuries fifteen months earlier); *Bennett v. Jones*, 218 Ga. App. 714, 715 (1995) (upholding preexisting condition jury charge where the evidence showed that the plaintiff had headaches before and after the car accident for which she was suing); *Binns v. MARTA*, 168 Ga. App. 261, 264 (1983) (upholding trial court's submission of the issue of compensatory damages to the jury where the plaintiff was disabled by a prior head injury but there was evidence the plaintiff had received treatment for a new injury from the bus crash at issue, and stating that "[i]t is well established that recovery may be had for aggravation of a pre-existing condition or disease"); *Jackson Atlantic, Inc. v. Wright*, 129 Ga. App. 857, 863 (1973) (holding that the evidence warranted a jury charge on aggravation of injury where the plaintiff's diabetic condition caused infections from a surgery after the fall at issue), recognized as overruled sub silentio in part on other grounds in *Benefield v. Vance*, 315 Ga. App. 505, 508–09 & n.14 (2012). But, like *Bray* and *Hampton*, none of these cases foreclose a preexisting condition charge where the preexisting condition is caused by the defendant or by related malpractice and the plaintiffs' allegations focus on the defendant's subsequent negligence that made the preexisting condition worse.

Thus, Clark's bowel perforation could serve as a

preexisting injury that the doctors aggravated in their post-surgery negligence. On appeal, that is the doctors' only argument as to why the evidence did not support the giving of the charge. Accordingly, we conclude that the trial court did not err in instructing the jury on aggravation of preexisting conditions.

C. *The trial court did not err by denying the doctors' motion for new trial on the general grounds.*

Finally, the doctors contend that the trial court erred in denying the doctors' motion for new trial on the general grounds by refusing to exercise discretion and weigh the evidence. But the trial court's order denying the doctors' motion for new trial shows that the trial court properly exercised its discretion as the thirteenth juror, so this claim fails.

We have described the trial court's discretion to grant a new trial on the general grounds as follows:

A trial judge may grant a new trial if the verdict of the jury is "contrary to ... the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial — commonly known as the "general grounds" — require the trial judge to exercise a "broad discretion to sit as a 'thirteenth juror.'" *Walker v. State*, 292 Ga. 262, 264 (2013). In exercising that discretion, the trial judge must consider some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence. See *Choisnet v. State*, 292

Ga. 860, 861 (2013). Although the discretion of a trial judge to award a new trial on the general grounds is not boundless — it is, after all, a discretion that "should be exercised with caution [and] invoked only in exceptional cases in which the evidence preponderates heavily against the verdict," *Alvelo v. State*, 288 Ga. 437, 438 (2011) — it nevertheless is, generally speaking, a substantial discretion.

*White v. State*, 293 Ga. 523, 524–25 (2013) (cleaned up). See also *Hosp. Auth. of Gwinnett County v. Jones*, 259 Ga. 759, 765–66 (1989) (discussing OCGA § 5-5-20 in the civil context), judgment vacated sub nom. *Hosp. Auth. of Gwinnett County, Ga. v. Jones*, 499 US 914 (1991), and judgment reinstated, 261 Ga. 613 (1991). "When considering a general grounds claim, we do not independently review the record as a thirteenth juror. The decision to grant or refuse to grant a new trial on the general grounds is vested solely in the trial court." *Norwood v. State*, 323 Ga. 182, 187 (2025) (quotation marks omitted). Instead, "we presume, in the absence of affirmative evidence to the contrary, that the trial court did properly exercise such discretion." Id. (quotation marks omitted). "On appeal, we may assess only whether the trial court exercised that discretion." *Upshaw v. State*, 323 Ga. 257, 266 (2026) (cleaned up).

Here, in addition to challenging the verdict form, the doctors argued in their motion for new trial that the court should exercise its powers as the thirteenth juror. In denying the doctors' motion for new trial on the general grounds, the trial court cited the general grounds statutes, OCGA §§ 5-5-20, 5-5-21, and the correct standard, see *White*, 293 Ga. at 524–25, as well as other cases from this Court discussing the general grounds. See *Walker*

*v. State*, 292 Ga. 262, 264 (2013); *Alvelo*, 288 Ga. at 438; *Willis v. State*, 263 Ga. 597, 598 (1993); *Ricketts v. Williams*, 242 Ga. 303, 304 (1978). The trial court then evaluated the evidence, noting some of the potential inconsistencies in the testimony of the Clarks' expert witness, Dr. Jose Trevino. The trial court expressly declined "to discredit or ignore" aspects of Dr. Trevino's trial testimony, noting that Dr. Trevino was "cross-examined extensively" and that Dr. Trevino explained that he believed the nonparty surgeons "contributed to the overall demise." But, as noted by the trial court, "Dr. Trevino also explained that much, if not all, the damage that led to Clark's death was [two days post-operation], or earlier[.]"So "[g]iven that, and the [c]ourt's precise instructions on testimony given by experts being an issue for the jury[,] along with instructions on general credibility, prior inconsistent statements, and the prevailing burdens of proof[,]" the trial court concluded that it was "not convinced that the jury reached a verdict on evidence that preponderated against the ultimate verdict." The trial court further stated that "[t]here is no question that the jury was to, and did, evaluate the credibility of all witnesses[.]" Finally, the trial court stated that there was "sufficient evidence to support the jury's verdict" as to causation and that, "given that the [c]ourt should interpret the evidence and verdict in favor of upholding the jury's decision, the apportionment of some fault to Dr. Woodyard, and the lack of such allocation to Dr. Williams[,] … as well as the ambiguity created by Dr. Williams's operative note [from a subsequent surgery on Clark]" that was originally relied upon by Dr. Trevino, was "sufficient to uphold the verdict" and "the jury's ultimate conclusion, based upon the clash in evidence."

Although some of the trial court's language referencing deference to the jury or sufficiency of the evidence might be problematic if viewed in isolation, the trial court's order as a

whole indicates that it understood and correctly exercised its discretion as the thirteenth juror. This is evident from the trial court's citation of the correct statutes and standards for its exercise of its thirteenth-juror power and from the trial court's independent evaluation of key evidence at trial.

The doctors point to three cases in support of their contention that the trial court improperly exercised its thirteenth-juror discretion in this case. See *White*, 293 Ga. 523; *Choisnet*, 292 Ga. 860; *Manuel v. State*, 289 Ga. 383 (2011). But none of these cases apply here. *White* vacated and remanded a case for a trial court to revisit the general grounds motion where the trial court repeatedly articulated an incorrect standard and did not articulate anything consistent with the proper standard. See *White*, 293 Ga. at 525. Similarly, *Choisnet* vacated and remanded where the trial court in considering the general grounds had cited *Jackson* and stated that conflicts in testimony were matters of credibility for resolution by the jury. See 292 Ga. at 861. And *Manuel* vacated and remanded where the trial court in rejecting the general grounds argument used the phrase "sufficient evidence," cited *Jackson*, and stated that it "personally disagreed with the jury's verdict." 289 Ga. at 386. Here, unlike *White*, *Choisnet*, and *Manuel*, the trial court in this case cited the correct standard and demonstrated that it evaluated the evidence itself, and the trial court did not state that it personally disagreed with the jury's verdict. The trial court here also did not cite *Jackson*, and although the trial court did reference the sufficiency of the evidence to sustain the verdict and state that it "should interpret the evidence and verdict in favor of upholding the jury's decision," the trial court's order viewed as a whole shows that it exercised its discretion as the thirteenth juror under the correct standard — a discretion which, as we have advised and as the trial court recognized in its order, "should be exercised with

caution and invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *White*, 293 Ga. at 524–25 (cleaned up).

As such, we will not disturb the trial court's decision denying the doctors' motion for new trial on the general grounds.

D. *Our holding that the trial court erred in applying the cap statute means that the trial court now needs to resolve on remand the doctors' excessiveness claim as to the jury's award for wrongful death.*

The doctors also raised an excessiveness claim in their motion for new trial. In its order denying the doctors' motion for new trial, the trial court rejected the excessiveness claim as to the jury's award for pain and suffering, and declined to rule on the merits of the doctors' excessiveness claim as to the wrongful death award, concluding that the trial court's grant of the motion to remit and amend the judgment mooted that claim. Our holding that the trial court erred in applying the cap statute means that the trial court now needs to resolve on remand the doctors' excessiveness claim as to the jury's award for wrongful death. Thus, we vacate the trial court's grant of the doctors' motion to remit and amend the judgment applying the cap statute to limit the wrongful death award, and we remand for the trial court to decide the doctors' excessiveness claim as to the wrongful death award raised in their motion for new trial and to enter judgment accordingly.

*Judgment vacated and case remanded with direction. All the Justices concur.*

BETHEL, Justice, concurring.

I join the opinion and the judgment of the Court which, in the portion relevant to this separate writing, adheres to the framework and holding of *Nestlehutt*. In doing so, I wish to note that there is, in my view, reason to doubt that the *Nestlehutt* framework accurately captures the correct understanding of the right to trial by jury secured in our Constitution. It seems to me that *Nestlehutt* and some of our other precedent may not have properly construed the bounds of that right as it was originally understood when it was included in our Constitution.[23] It is tough to tell, and, for me, that is an excellent basis upon which to rely on the principles of stare decisis to leave decided that which has been decided.

It may well be that the jury trial right secured in our Constitution was generally understood to be a procedural right. Indeed, the opinion of the Court convincingly articulates the

---

[23] When we endeavor to discern the original public meaning of legal language, our pursuit is inevitably limited by a number of factors. Among the most challenging obstacles we encounter are (in my view): (1) limited contemporary resources articulating common understanding of the words, phrases, or provisions; and (2) the remoteness in time of the original language. Both are present here. I see no particularly persuasive authority for what exactly the right to trial by jury, as it existed in Georgia in the late 1700s, was meant to protect in the civil litigation space concerning the nature of claims it applied to, the extent of the juries' exclusive role with respect to those claims, and the limitations on the General Assembly's authority to alter, abolish, or supplant those claims and roles. And Georgia courts did not meaningfully analyze that question for quite some time. Of course, these limitations are no basis for abandoning the pursuit of discerning, as best we are able, what was meant when the rule was adopted. Judges are not authorized to simply make up what we think the Constitution means or should mean. But we should acknowledge the challenges and limitations we face in finding the true meaning of the law.

Blackstonian description of that right as procedural in nature. From there, floating on a genuinely inspiring sea of patriotic fervor from the founding generation celebrating the vital nature of the right, we conclude that a bulwark so meaningful must have more than procedural value. But, regrettably, beyond expressions extolling the general value of the right, it appears that we have very little in the way of substance on which we can rely to conclusively determine that it is a substantive right.[24]

Meanwhile, there seems to be a reasonable possibility that the right ought to be considered even more robust than our precedent suggests. After all, we have indicated that "to determine whether a party has a right to a jury trial for a particular claim, we must determine whether such a claim existed and was decided by a jury in Georgia in 1798." *Taylor v. Devereux Foundation, Inc.*, 316 Ga. 44, 58–59 (2023). This understanding feels clear and firm, and I read it to mean that, if a litigant has the sort of claim that was entrusted to a jury before 1798, then the legislature cannot deprive the litigant of the right to a jury on that claim. So I am at a loss for how that rule squares with our precedent in other contexts.

---

[24] Of course, given the reality of parliamentary supremacy that existed in the world Blackstone observed, it is not surprising that we would not find descriptions of a more substantive understanding of the right: If nothing could restrict Parliament's power to substantively circumscribe the jury trial right, one would not expect to find indicia of inviolable, substantive aspects of that right. But a central outcome of the American Revolution was the establishment of governments both defined and circumscribed by written constitutions which included substantive provisions beyond legislative reach. But that change, while immensely important, does not support a conclusion that old words about the right gained new meaning when incorporated into constitutions. Knowing that the right was made more secure does not help understand its scope – just its relative vulnerability.

For example, in the context of workers' compensation claims, we have said that the right to a trial by jury does not apply to a claim subject to the Workers' Compensation Act because the legislature was authorized by statute to create a "special" proceeding. See *Metropolitan Casualty Ins. Co. v. Huhn*, 165 Ga. 667, 671–72 (1928) (explaining that the right to trial by jury, while "guaranteeing the continuance of the right unchanged as it existed either at common law or by statute in the particular State at the time of the adoption of the constitution," did not apply to a claim subject to the Workers' Compensation Act, apparently because the legislature is authorized by statute to create a "special" proceeding—not known at the time of the first constitution—to effectively supplant a proceeding subject to the then-existing jury trial right with one that was not). The reasoning behind *Huhn*'s holding seems to turn on acceptance of the idea that the constitutional jury-trial right does not preclude the legislature from providing "for a trial without a jury in cases similar to those in which such a trial was in use prior to the adoption of the constitution." Id. at 672. Candidly, this makes no sense at all to me. How could it be true that the right of an employee[25] to sue her employer in a jury trial for workplace

_____

[25] Before the advent of workers' compensation statutes, employees could sue employers for work-related injuries under ordinary common law tort theories. See, e.g., *Rowland v. Cannon*, 35 Ga. 105 (1866) (reversing judgment in favor of widow of deceased railroad employee based on employee's contributory negligence); *Western & A.R. Co. V. Bishop*, 50 Ga. 465 (1873) (holding that railroad worker could contractually assume the risk of injury during employ, unless employer committed criminal negligence); *Campbell v. Atlanta R.A.L.R. Co.*, 53 Ga. 488 (1874) (affirming grant of new trial in employee-employer injury suit because plaintiff must show that injury was caused without fault or negligence on his own part); *Georgia R. & B. Co. V. Rhodes*, 56 Ga. 645 (1876) (the fellow servant rule, which ordinarily limits

71

injuries — a right that existed in the late 1700s and was protected in the *constitution* — can vanish upon the creation of an alternative and exclusive[26] *statutory* scheme? And, if all that is required to obviate the constitutional right is for the General Assembly to enact an alternative statutory scheme, what value is there in the constitutional right, and why couldn't the Act in consideration in the present case represent the General Assembly's effort to provide a new non-jury (or limited jury) solution?

I say this not to sow doubt about the state of workers'

---

employee recovery for workplace injury caused by fellow employee, is no bar to recovery where injury to one employee, caused by another employee, is not due to injured employee's own negligence). See also *Priestley v. Fowler*, 150 Eng. Rep. 1030 (Exch. 1837) (first reported case of employee suing employer for workplace injury); Michael A. Stein, Priestley v. Fowler *(1837), and the Emerging Tort of Negligence*, 44 B.C. L. Rev. 689,689 (2003)). Of course, as the cases listed here illuminate, the extraordinary challenges faced by employees in pursuing these cases were a driving force behind the nationwide movement to secure workers' compensation schemes. And these schemes were roundly upheld against various challenges, including right to trial by jury challenges, across the nation — often by circular reasoning and rarely, if ever, by squarely addressing the right to a trial by a jury which was (arguably) lost. See, e.g., *Sims v. U.S. Fidelity & Guar. Co.*, 782 N.E.2d 345, 352 (Ind. 2003); *Oliver v. Travelers Ins. Co.*, 103 Wis.2d 644, 651 (1981); *Breimhorst v. Beckman*, 227 Minn. 409 (1949); *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156 (1911). See also *Mountain Timber Co. v. Washington*, 243 US 219, 235 (1917) (rejecting Seventh Amendment challenge to state workers' compensation statute).

[26] See, e.g., *Satilla Community Serv. Bd. v. Satilla Heath Servs.*, 275 Ga. 805, 806 (2002) ("Workers' compensation is the exclusive remedy of employees against employers for work-related injuries." (quotation marks omitted)); OCGA §34-9-11(a) ("The rights and the remedies granted to an employee by [the Act] shall exclude and be in place of all other rights and remedies of such employee … and all other civil liabilities whatsoever at common law or otherwise, on account of such injury, loss of service, or death[.]").

compensation law in Georgia. The *enormous* reliance interest built up around the long-standing workers' compensation system would, of course, strongly weigh against revisiting our precedent in that space — even if we were to conclude our precedent was wrongly decided. I reference it here only to exemplify the mushiness of our precedent, in addition to the historical, contextual, and linguistic record, with respect to this inarguably important constitutional right. It's unsettling.

Having completed my detour, I restate my agreement with the Court that *Nestlehutt* ought not be disturbed.[27] It finds support as laid out by the Court and neither the parties or amici, nor my own review, have produced compelling evidence that a different understanding is more likely correct.

---

[27] I also think there is much to be said about how we should understand the minor textual changes, over the course of successive constitutions, the provisions securing the jury trial right, the temporary omission of the right from our constitutions in place during portions of the 1860s, and the potential interplay between these facts and our understanding of constitutional continuity where we issued holdings about the meaning of the right at various points in time — I'll not venture further into that kaleidoscope of possible understandings and interpretations in this writing.